James McCLENDON and Elizabeth
McClendon, as Next Friends of
Kristen McClendon, a Minor, Petitioners,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–579V.

United States Claims Court.

May 21, 1991.

Michael G. McLaren, Memphis, Tenn., atty. of record, for petitioners.

Richard A. Schollman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## REMAND ORDER

### REGINALD W. GIBSON, Judge.

James and Elizabeth McClendon (petitioners) filed a claim under the National Vaccine Injury Compensation Program, *codified as amended at* 42 U.S.C.A. §§ 300aa–10 *et seq.* (West Supp.1991) (the Program), seeking compensation for certain injuries incurred by their daughter, Kristen McClendon. In this regard, Mr. and Mrs. McClendon alleged—that Kristen received a DPT vaccination on October 21, 1982; that she experienced an encephalopathy[1] and a seizure within the next three days as a result of that vaccination; and that these injuries caused a residual seizure disorder,[2] mental retardation, and generally impaired her development. The respondent argued, however, that Kristen suffered a residual seizure disorder of unknown etiology, and that this condition was unrelated to the DPT vaccination. Thus,

Special Master Paul T. Baird was presented with an issue of causation, and on March 8, 1991, concluded that, having failed to prove either the occurrence of a table injury or causation-in-fact by a preponderance of the evidence, petitioners are not entitled to a compensation award under the Program. The McClendons objected to that determination, and filed a motion for Claims Court review on April 5, 1991, arguing that it was arbitrary, capricious, an abuse of discretion, and contrary to law. For the reasons stated below, we remand the petition for further consideration.

## BACKGROUND

The essential facts in this case are as follows: Kristen was born without complications in Jackson, Mississippi, on April 17, 1982, with a congenital anomaly in her urinary tract that made her susceptible to infections.[3] It is uncontroverted that she had no other problems during the first several months of her life, and thereafter tolerated two DPT vaccinations without incident. In fact, immediately after her third DPT vaccination on October 21, 1982, Kristen appeared to be bright, alert, and responsive. Moreover, prior to her third DPT shot, she had never experienced a seizure or convulsion. However, on October 22, 1982, she experienced a loss of appetite and became irritable. In addition, Kristen began crying and screaming inconsolably, as though she were in pain, and did not stop until sometime on October 23, 1982. The petitioners claim that this crying and screaming continued unabated for 36 hours, overlapping October 22 and 23, 1982.

---

1. For the purposes of compensation proceedings under the Program, an encephalopathy is broadly defined as "any significant acquired abnormality of, or injury to, or impairment of [the] function of the brain." Signs or symptoms include high-pitched and unusual screaming or persistent, inconsolable crying. § 300aa–14(b)(3)(A).

2. In cases such as this one involving the DPT vaccine, a residual seizure disorder may be deemed to have occurred if "the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less

than 102 degrees Fahrenheit" (§ 300aa–14(b)(2)) and "the first seizure or convulsion occurred within 3 days after [the] administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit" (§ 300aa–14(b)(2)(B)).

3. This congenital anomaly also had the potential to cause bilateral urethral reflux, meaning that urine could back up into the bladder and kidneys.

Also on October 23, 1982, the McClendons observed that Kristen was fussy and cold. They stated that Kristen "shivered" as though she were cold, and that she "jerked or twitched" on at least one occasion that day. The McClendons allege that this was a seizure because they observed similar behavior on many subsequent occasions when Kristen experienced recognized seizures. Similarly, on October 24, Kristen was fussy and continued to shiver as on the previous day. On October 25, 1982, she was placed in the care of a babysitter, who also noticed a reduced or loss of appetite, and observed jerking motions. Kristen developed a 103.5 degree temperature on October 26, 1982, and experienced a generalized seizure. In view of such, the McClendons took her to the hospital emergency room where she was diagnosed with a febrile seizure[4] and a urinary tract infection. The urinary tract infection was subsequently described as pyelonephritis, a condition that is characterized by fever, shaking chills, pain in the costovertebral region and flanks, and symptoms of bladder inflammation.

On October 29, 1982, she was admitted to the hospital for further examination of her renal condition, and some of those tests indicated that one of her kidneys was functioning at half its normal capacity due to a urinary tract infection. Thereafter, on November 23, 1982, Kristen was taken to the hospital with a temperature of 102 degrees, and the parents reported that she had been having seizures at home. On her visit to the pediatrician on November 29, 1982, the record notes that she was very fussy and fretful. On November 30, 1982, she was hospitalized, at which time her kidneys were examined and appeared normal. Kristen had a grand mal seizure on January 3, 1983, and was taken to the hospital with a 101.5 degree temperature. She had a seizure again on January 4, 1983, and a fever of 101 degrees. An EEG was performed, and it showed some generalized and slightly more pronounced right-sided slow dysrhythmia. On January 23, 1983,

Kristen began to run a fever and had a generalized tonic-clonic seizure. She was taken to the hospital where she had additional seizures and a 102.4 degree temperature.

## DISCUSSION

The question presented to the special master on the above facts was—whether the petitioners proved the requisite causal relationship between the October 21, 1982 DPT vaccination and her subsequent injuries. The petitioners asserted that they were entitled to compensation under the Program—because Kristen was vaccinated with DPT; because an encephalopathy and a seizure occurred within 72 hours; and because those injuries in turn caused a residual seizure disorder, mental retardation, and impaired development. Thus, they claimed that compensation was due on the basis of either a "table injury" or causation-in-fact. The respondent, on the other hand, averred that Kristen suffered a mixed-seizure disorder of cryptogenic etiology unrelated to the DPT vaccine. On that basis, therefore, it argued that there was no table injury as well as no causation-in-fact.

As a consequence of the special master's conclusion that there were no compensable grounds for an award under the Program, the petitioners filed a motion for review. Thus, we are now confronted with the same issue as that presented to the special master—whether the petitioners established, by the requisite quantum of proof, the necessary causal relationship between the DPT vaccination and the injuries suffered by Kristen. Our review in this search is governed by § 300aa–12(e)(2), which gives us the authority to:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

---

4. "Nonfebrile" or "afebrile" seizures are those that occur either without an accompanying fever, or with an accompanying fever of less than 102 degrees. § 300aa–14(b)(2)(B). Thus, "febrile" seizures are seizures that occur with an accompanying fever of *102 degrees or higher.*

accordance with law and issue [our] own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

After thoroughly reviewing the decision by Special Master Baird, we have decided to remand the petition for further consideration under § 300aa–12(e)(2)(C) for two reasons. First, we find that the special master did not make all of the findings of fact and conclusions of law required by the general rule of eligibility stated in § 300aa–13(a), and that these shortcomings prevent us from conducting an effective § 300aa–12(e)(2) review of his report. Secondly, the special master decided this matter before the Court of Appeals for the Federal Circuit (CAFC) disseminated its opinion in *Bunting v. Secretary of the Department of Health and Human Services*, 931 F.2d 867 (Fed.Cir.1991). Given the criticality of that decision, we believe that the special master would be well advised to sharply reconsider his treatment of the expert medical testimony *as well as the entire record evidence adduced at bar* in the context of *Bunting*. Now we will discuss the statutory scheme for proving causation and thereafter our reasons for remanding the petition for further consideration.

## A. *The Statutory Scheme*

The standards for proof of causation are stated in § 300aa–11(c)(1), which requires petitioners to show that the injured individual:

(A) received a vaccine set forth in the Vaccine Injury Table [5]....

\*  \*  \*  \*  \*  \*

(C)(i) sustained ... any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with

the vaccine referred to in subparagraph (A) ... and the first symptom or manifestation of the onset ... of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

(ii)(I) sustained ... any illness, disability, injury or condition not set forth in the Vaccine Injury Table but which was caused by the vaccine referred to in subparagraph (A), or

(II) sustained ... any illness, disability, injury or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset ... which did not occur within the time period set forth in the Table but which was caused by the vaccine referred to in subparagraph (A).

Thus, compensation will be allowed if a petitioner can establish on the record as a whole either a "table injury" under § 300aa–11(c)(1)(A) and (C)(i), or causation-in-fact under § 300aa–11(c)(1)(A) and (C)(ii).[6] A table injury is the easier of the two theories to prove because it is really nothing more than a doctrine of presumed causation. *See Bunting*, at 871–72. As codified in § 300aa–11(c)(1)(A), and (C)(i), it requires the petitioners to confirm the existence of three essential elements. They must show, first, that a vaccine listed on the table was administered; secondly, that one or more of the injuries listed on the table occurred; and thirdly, that the first symptoms of injury appeared within the time frame listed on the table. In the context of the case at bar, we observe that DPT is a vaccine listed in the table, and the table time frame for an encephalopathy and a residual seizure disorder, the injuries alleged by the McClendons, is three days. § 300aa–14(a)(I)(B) and (D).

---

**5.** The Vaccine Injury Table is codified at § 300aa–14.

**6.** In devising this system, and the table injury concept in particular, Congress meant to establish "a compensation procedure that administer[s] awards 'quickly, easily, and with certainty and generosity.' The system was intended ...

'to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury.'" H.R. Conf.Rep. No. 101–386, 101st Cong., 1st Sess. 512–513, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3112, 3115.

The causation-in-fact theory is codified in § 300aa–11(c)(1)(A), and (C)(ii).[7] Under this more onerous alternative, it is not imperative for the petitioners to show that the injury is one listed on the table. § 300aa–11(c)(1)(C)(ii)(I). It is also unnecessary to prove the existence of a temporal (*i.e.*, time requirement) relationship between the administration of the vaccine and the injury. § 300aa–11(c)(1)(C)(ii)(II). *See also Bunting*, at 871–72 (variances from the table are not intended to act as presumptions against a petitioner attempting to prove causation-in-fact) (citation omitted). Therefore, compensation will be allowed if a listed vaccine was administered and where the petitioners can demonstrate that the vaccine actually caused injury.

All eligibility determinations under the Program, including findings of fact and conclusions of law relating to the issue of causation, are governed by the standards contained in § 300aa–13(a), which states that:

(a) General rule

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds *on the record as a whole*—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or medical opinion.

(2) For purposes of [§ 300aa–13(a)(1)], the term "factors unrelated to the administration of the vaccine"—

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

(B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances, which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

(emphasis added).

■ Against this background, therefore, the first step in analyzing a compensation claim under the Program is outlined in § 300aa–13(a)(1)(A). Regardless of the causation theory being asserted, it is incumbent upon the petitioners to prove each required element by "[a] simple preponderance of the evidence; not scientific certainty." *Bunting*, at 873. Proof by a "preponderance" means that the petitioner must adduce evidence that makes the existence of a contested fact more likely than not. E. Cleary, *McCormick's Handbook on the Law of Evidence,* § 339 (1984); *Black's Law Dictionary* 1064 (5th ed. 1979) (a preponderance of the evidence is "that degree of proof which is more probable than not"). To establish a table injury pursuant to the preponderance standard, therefore, the petitioner must simply show that it is more probable than not that the injured individual received a listed vaccine, § 300aa–11(c)(1)(A), and that it is more probable than not that an injury listed on the table occurred within the table time frame, § 300aa–11(c)(1)(C)(i). As *Bunting* plainly indicates, this is a very hospitable standard, and the evidence adduced by the petitioners should, of course, be weighed

---

**7.** Regardless of the method of proof, petitioners seeking compensation must also meet certain citizenship and location requirements. § 300aa–11(c)(1)(B). In addition, they must show that the residual effects of the injury lasted for more than six months causing unreimbursable expenses in excess of $1,000 (§ 300aa–11(c)(1)(D)), and that they have not previously collected any award or settlement as a result of the injury. § 300aa–11(c)(1)(E).

accordingly.[8] When causation-in-fact is the theory alleged, the petitioners must demonstrate that the injured individual received a listed vaccine, § 300aa–11(c)(1)(A), and that it is more likely than not that the vaccine actually caused the injury, § 300aa–11(c)(1)(C)(ii).

■ If the petitioners make a prima facie case showing the existence of either a table injury or causation-in-fact, the special master must next address the question of alternative causation under § 300aa–13(a)(1)(B). That section instructs the special master to determine—whether it is more probable than not that the injuries incurred by the petitioner were caused by a factor "unrelated to the administration of the vaccine." In this respect, we observe that "[i]t is not [the petitioners'] burden to disprove every possible ground of [alternative] causation suggested by the defendant, nor must the findings of [the special master] meet the standards of the laboratorian." *Tinnerholm v. Parke, Davis & Co.*, 285 F.Supp. 432, 440 (S.D.N.Y.1968), *aff'd*, 411 F.2d 48 (2d Cir.1969), *cited with approval in Bunting*, at 873. A determination by the special master relative to alternative causation must also be based on more than mere supposition or guesswork. § 300aa–13(a)(2). Moreover, every determination under § 300aa–13(a)(1)(A) and § 300aa–13(a)(1)(B) *requires a specific finding of fact*, which, in turn, must be substantiated "by [reference to] medical records or medical opinion." § 300aa–13(a)(1). Only after all of these steps are completed is it possible for the special master to conclude, first, whether the petitioners have established, by a preponderance of the evidence, a causal relationship between the vaccine and the injuries, and second, whether there is not a preponderance of the evidence that the injury is due to alternative causation factors. Such detailed findings and conclusions are indispensable prerequisites to effective and timely review in the Claims Court.

*B. The Need For A Remand*

1. Insufficient Findings and Conclusions on Causation Issues

■ As the primary reason for remanding this petition, we find that the special master did not make all of the findings of fact and conclusions of law required under § 300aa–13(a), which, of course, are essential to our review under § 300aa–12(e)(2). With respect to causation issues, § 300aa–13(a)(1)(A) explicitly directs the fact finder, the special master here, to determine whether "the petitioner has demonstrated by a preponderance of the evidence" the elements necessary to establish either a table injury under § 300aa–11(c)(1)(A) and (C)(i) or causation-in-fact under § 300aa–11(c)(1)(A) and (C)(ii). We think it goes without saying that those findings must be *specific*, and that they *must pointedly* reference the evidence relied on to show that the existence or, as the case may be, the absence of each required element is more probable than not. Moreover, the plain language of § 300aa–13(a)(1)(A) requires the special master to make this analysis and finding *before* reaching, and without reference to, the question of alternative causation under § 300aa–13(a)(1)(B). In other words, § 300aa–13(a)(1)(B) should be applied only if and when the petitioner has established a prima facie case of entitlement under § 300aa–13(a)(1)(A).

■ A close inspection of the report before us reveals that the special master did not make the focused findings and conclusions required by § 300aa–13(a)(1)(A). It appears that the reason for this deficiency lies in the fact that his decision to deny compensation is based, in reality, on a theory of alternative causation which does not specifically identify § 300aa–13(a)(1)(B) as

---

**8.** Indeed, we note that the legislative history seems to suggest that the petitioners' assertions of a table injury should be judged in a most favorable manner. In this context, Congress stated that "[c]ompensation is to be awarded if the court determines on the basis of the record as a whole that (1) the petitioner has demon-

strated those matters required by [§ 300aa–11(c)] above ... and (2) there is not a preponderance of the evidence that the injury was caused by factors unrelated to the vaccine." H.R.Rep. No. 908, 99th Cong., 2d Sess. 18, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6359.

the basis for his findings and conclusions. Moreover, the paltry findings that he did make which might *arguably* indicate alternative causation appear to be based on a standard of proof inconsistent with § 300aa–13(a)(1)(B). We will briefly discuss each of these related deficiencies in turn.

It is obvious that the special master premised his decision on a finding that the injuries incurred by Kristen were due to factors unrelated to the DPT vaccine. In this context, his report shows that he found no table injury and no causation-in-fact because of the urinary tract infection that was diagnosed on October 26, 1982. More specifically, he first concluded that there was no causation-in-fact because he found that all of the seizures that occurred outside the table time limit were "fully explainable" as febrile seizures "resulting from the seizure which accompanied the pyelonephritis." In other words, he eliminated causation-in-fact as a theory for relief solely because all of the injuries that occurred outside the three-day table time limit for presumed causation were "just as likely" to have been caused by the urinary tract infection as by the DPT vaccine.

Similarly, the special master determined that there was no table injury, primarily because the symptoms that occurred within the three-day table time frame were also "just as likely" to have resulted from the urinary tract infection. With respect thereto, the petitioners asserted that the shivering, jerking, and twitching that they observed on October 23 indicated seizure activity, which is an injury listed on the table, and they corroborated that claim with the expert medical opinion testimony of Dr. Mark Geier. They also claimed that Kristen experienced an encephalopathy, a claim that was also supported by the testimony of Dr. Geier. He explained that in his medical opinion these indicia of a seizure, along with the inconsolable crying and screaming, the irritability, and the loss of

appetite also pointed to the existence of an encephalopathy.

Nevertheless, without adequately discrediting the testimony of Dr. Geier, *see infra,* the special master found that these symptoms did not establish either a table seizure disorder or a table encephalopathy. In this sense, he determined that the October 23 shivering episodes did not prove the onset of a table seizure disorder because those symptoms *"were just as likely* to have been related to the serious urinary tract infection ... as to the DPT vaccine which was administered on October 21" (emphasis added).[9] He also concluded that the petitioners did not prove a table encephalopathy because the shivering and inconsolable crying were the only statutorily-recognized indicia of encephalopathy, and these factors alone did not prove that Kristen experienced an encephalopathy within the three-day table time frame. Consequently, the special master stated that "there [was] no *clear* evidence in this record that an encephalopathy occurred" (emphasis added).

The foregoing shows that the special master failed to actually determine— whether the petitioners "demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1)," as he was required to do under § 300aa–13(a)(1)(A). Instead of ascertaining whether the petitioners satisfied their initial *statutory* burden of proof, the special master went right to the second step outlined in § 300aa–13(a)(1)(B), and rejected the petitioners' claim because he believed that the injuries that occurred here could have been caused by the urinary tract infection. The ultimate conclusion of this alternative causation analysis may not necessarily be incorrect, but by failing to properly cite § 300aa–13(a)(1)(B) as the basis for his decision and to examine the evidence in the context of that statutory language and its corollary provisions, *see* § 300aa–13(a)(2), the special master failed to make the appropriate findings or conclu-

9. The special master failed to discuss whether the many subsequent seizures could be viewed as evidence that might have corroborated a finding that the shivering, shaking, and twitching on October 23 indicated the onset of a seizure disorder. *Cf.* § 300aa–13(a) (the fact finder must consider the record as a whole).

sions. In addition, the tone of the report leaves us with the inescapable feeling that the special master did not carefully scrutinize the *entire* record, as he is statutorily required to do pursuant to § 300aa–13(a)(1). In short, the report does not contain the focused factual findings that are necessary for us to determine whether the ultimate conclusions are arbitrary, capricious, an abuse of discretion, or contrary to law.[10]

■ Moreover, in concluding that there was an alternative cause for Kristen's injuries, it appears that the special master initially applied the incorrect standard of proof when he found that the evidence did not establish the occurrence of a table seizure disorder. Here, the special master did not employ the "more probable than not" standard when he found that the October 23 shivering, jerking, and twitching episodes did not prove the onset of a table seizure disorder. Instead, he blandly concluded that these symptoms did not establish the existence of a table seizure because the shivering, jerking, and twitching was "just as likely" caused by the urinary tract infection. As we have already explained, the special master may not make a finding that the injuries were due to factors unrelated to the administration of the vaccine, and thus, may not deny compensation on the basis of alternative causation, without analytically *applying* the preponderance of the evidence standard. If the special master intends to conclude that there is alternative causation under § 300aa–13(a)(1)(B), this means that it *must* be more probable than not that the injuries were caused by some agent other than the vaccine. Thus, alternative causation must be established

as well by a preponderance of the evidence under § 300aa–13(a)(1)(B), and the "just as likely" phrase is not compatible with that standard. Facially at least, we hold that this phrase suggests an incorrect application of the statute.[11]

In sum, therefore, we find that the special master failed to make those findings and conclusions necessary to determine whether the petitioners satisfied their burden of proof under § 300aa–13(a)(1)(A) without reference to the possibility of alternative causation. Further, the special master seems to have based his ultimate decision to deny compensation on the basis of alternative causation under § 300aa–13(a)(1)(B), yet he did not explicitly mention it in his report, and failed to make his findings and conclusions in light of that statutory language. Finally, in weighing the evidence, the special master seems to have employed a standard of proof that is inconsistent with the statutory preponderance of the evidence standard. As a consequence of these combined deficiencies, we cannot properly evaluate whether the special master's decision to deny relief on the basis of alternative causation was arbitrary, capricious, an abuse of discretion, or contrary to law. Thus, we find that the matter must be remanded for appropriate and focused findings of fact and conclusions of law under § 300aa–13(a).

### 2. The Proper Use of Medical Expert Testimony

The second reason for remanding this case stems from the recent *Bunting* decision, and its guidance regarding expert opinion testimony. *Bunting* was decided after the special master issued his report

---

**10.** In this context, we observe that:

"[T]he findings must be specifically detailed to give [the reviewing court] a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts." *Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 433 (5th Cir. 1977). "This court cannot be left to guess. The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." *Hy-*

*drospace–Challenger, Inc. v. Tracor/MAS, Inc.,* 520 F.2d 1030, 1034 (5th Cir.1975). *Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1549 (11th Cir.1987).

**11.** Phrases such as "fully explainable" (no causation-in-fact) and "clear evidence" (no table encephalopathy) clearly do not equate with the "more probable than not" definition under the preponderance of the evidence standard. In this sense, therefore, the special master must take extreme care not to impose a burden or standard different than that imposed by Congress. *See Bunting,* at 873.

here, and we think he should have an opportunity to consider its impact on this petition before completing our review. That case involved the same broad issue as that at bar, *i.e.*, whether the evidence established the requisite nexus between the vaccine and the injury. The petitioners in *Bunting* attempted to prove that link under a causation-in-fact theory,[12] and adduced, in addition to their own testimony, medical records and opinion testimony of a medical expert. Of course, causation cannot be established by the claims of the petitioners alone, § 300aa–13(a)(1), so the petitioners relied heavily on the testimony of their expert. The special master concluded that the petitioners demonstrated actual causation by a preponderance of the evidence, but the Claims Court, on a *de novo* review, denied compensation because it could find no causation.

On appeal, the CAFC reviewed the evidence, relying heavily on the expert medical testimony adduced by the petitioners. Their (petitioners') expert opined based on the medical records that the symptoms and diagnosis established a recognized chronology between the injury and the administration of the vaccine. He also stated that the symptoms described by the parents and in the medical records were consistent with the diagnosis of an encephalopathy, and explained his opinion that there were no alternative causes. As a consequence, the CAFC concluded that the petitioners did in fact establish actual causation by a preponderance of the evidence and reversed the Claims Court.

■ In doing so, it rejected the Claims Court assertion that the opinion of the petitioners' expert was "at best ... speculative," noting that there was simply no support in the record for that statement. *Bunting*, at 872–73. We believe that the analysis of the expert testimony by the CAFC in *Bunting* highlights the significance of expert medical testimony, and provides enlightened guidance as to the amount of weight that should be given to

such evidence. In this respect, we find that *Bunting* implicitly instructs the fact finder to confer more than passing credence to the opinions of a medical expert. While it is true that the fact finder in vaccine cases is not bound by the opinions of a medical expert, § 300aa–13(b)(1), *Bunting* unequivocally establishes that such evidence cannot be rejected without a reasonable basis therefor. That is, the fact finder may not dismiss such testimony without providing a thorough, rational explanation for doing so because to do otherwise would be tantamount to arbitrary and capricious decision-making. The Claims Court in *Bunting* simply failed to provide such an explanation, and that appears to be the primary reason for the CAFC reversal.

■ We find that *Bunting* has significant application here. This is so because the special master, like the Claims Court in *Bunting*, provided the scantiest of reasons for discounting the opinions of the petitioners' medical expert. Here, petitioners adduced the testimony of Dr. Geier, who opined that Kristen suffered a table injury because she experienced both an encephalopathy and a residual seizure disorder within three days following the October 21, 1982 administration of the DPT vaccination. After concluding that the DPT could have caused the injuries at issue here, Dr. Geier also ruled out alternative causation by stating that the urinary tract infection could not have caused them. The special master rejected that testimony, as it was his prerogative under § 300aa–13(b)(1), but in doing so he stated only that "[i]n the opinion of the court, Dr. Geier was too ready to find an encephalopathy and dismissed too easily the possible complications of developing pyelonephritis."

To us, this cryptic and uninformative dismissal of Dr. Geier's testimony seems dangerously close to the unsupported assertion of the Claims Court in *Bunting*. We have scoured the report, and we have been unable to locate any additional basis for rejecting this evidence. There is no indica-

12. Although it was undisputed that a table vaccine was administered and that table injuries occurred, *Bunting* did not involve a table injury because there was no evidence that these injuries occurred within the three-day table time frame.

tion that it was discounted for lack of training, experience, or knowledge on the causes and symptoms of the injuries in issue, nor is there any suggestion that his testimony was so biased as to be unreliable. We believe, therefore, that the foregoing points to a lack of any rational basis for ignoring that expert testimony, while *Bunting* tacitly teaches this is the equivalent of arbitrary and capricious decision-making. On those grounds then, the petition must be remanded for full reconsideration of that opinion testimony and the record evidence as a whole, in the context of *Bunting*. In short, Dr. Geier's testimony must be compared and reconciled with the testimony of the parents, the medical records, and the testimony of the respondent's expert. We recognize that this may well be a painstaking process, but such analysis is required under the Program to ensure that those suffering from legitimate vaccine-related injuries are compensated according to merit. Moreover, we also seek to ensure that compensation is not denied in the face of the legislative admonishment that compensation should be awarded "quickly, easily, and with certainty and generosity" to those individuals with legitimate vaccine injuries.

### CONCLUSION

Therefore, the petition is hereby remanded for a period not to exceed 45 days from the date of this order, *i.e.*, July 5, 1991, for further findings of fact and conclusions of law as discussed hereinabove and in the context of *Bunting*. Finally, all findings, fact and opinion testimony, shall be serially numbered and cross-referenced to the transcript, an exhibit, or both. These proceedings *shall* be confined to the existing record.

IT IS SO ORDERED.

