PAULINE NEWMAN, Circuit Judge.
 

 This case concerns proof of causation of a Table Injury
 
 [1]
 
 , in accordance with the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-l
 
 et seq.
 
 The issue is whether the testimonial, documentary, and medical evidence established the requisite causal relationship between the vaccine and Bradley Bunting’s injury, in terms of the standard of proof pertaining to the Act.
 

 Gary G. Bunting, as representative of his son Bradley Bunting, appeals the decision of the United States Claims Court denying compensation under the Act.
 
 Bunting v. Secretary of the Dep’t of Health and Human Services,
 
 19 Cl.Ct. 738 (1990). We reverse on the issue of entitlement, and remand for determination of quantum.
 

 The Bunting Injury
 

 That Bradley Bunting was injured is not disputed. Nor is it disputed that the injuries (encephalopathy and seizure disorder) are listed on the Vaccine Injury Table of the National Childhood Vaccine Injury Act. 42 U.S.C. § 300aa-14(a). The history of Bradley’s injury is summarized as follows, as presented by his parents and physicians, by deposition and by live testimony at the hearing before the special master. This history is described in greater detail by the Claims Court, 19 Cl.Ct. at 742-50.
 

 When Bradley Bunting was bom, on December 29, 1983, the attending physician recorded no abnormality. The first of two diphtheria-pertussis-tetanus (DPT) vaccinations was administered on March 2, 1984. At that time Bradley’s parents were told by the pediatrician that side effects of the vaccine included drowsiness, irritability, and fever. Bradley’s parents testified that Bradley fell into a deep sleep that lasted the rest of March 2 and part of March 3, and had a slight fever. His parents were not alarmed because they had been told to expect such effects. The day after the vaccination Bradley was listless and drowsy, and exhibited a staring episode, which lasted between 15 and 20 minutes. A week later Bradley began favoring the use of his left arm, whereas he had previously favored his right arm. On March 27, 1984 Bradley was seen by his pediatrician, at which time Bradley’s mother mentioned that Bradley was favoring his left arm.
 

 On May 7, 1984 Bradley received the second DPT vaccination. The pediatrician’s record for that date states that Bradley had otitis media (ear pain). His parents immediately noticed swelling and tenderness at the site of the inoculation. On the following day Bradley cried inconsolably for two to three hours, and his right leg twitched rhythmically about every five seconds. The twitching subsided, but resumed on May 24, 1984. In early June, while on vacation in Jacksonville, Bradley’s mother noticed a bending type behavior.
 
 *869
 
 This was observed by his father on June 15, 1984, who testified that while he fed Bradley the child’s head came down and he was “face down into the tray of the high chair.” Gary Bunting reported this to the pediatrician by telephone the same day, and the earliest available appointment was made for June 29. The records of the Humana Hospital in Jacksonville show that Bradley was seen there by a doctor on June 27, 1984, and that Bradley’s mother reported a seizure the following day. Bradley was seen by his pediatrician on June 29, 1984. The pediatrician’s notes dated June 29 state that Bradley was suffering from “[sjtomach problems—tender to touch” and that Bradley “seems to have pain when eating”. The pediatrician’s notes dated July 3 describe Bradley’s seizures as a “moan-like groan, extreme pain, eyes get big, hands fold and fist and arms bend”.
 

 Bradley’s parents stated that “jackknife” seizures occurred about 10 times before June 29, 1984. The seizures became more frequent, and on July 3, 1984 Bradley was admitted to the Humana Hospital, where tests were conducted including an electroencephalogram (EEG). On the hospital’s form requesting the EEG it was recorded that Bradley “1 wk ago began having seizure like episodes”. The report on the EEG, dated July 10, 1984, was: “Impression: Abnormal EEG with bilateral spike and wave activities occurring independently consistent with seizure disorder.” The hospital records state that the pediatrician concluded at the June 29th examination that the behavior was due to ear pain.
 

 On July 16 the pediatrician recorded that three afebrile seizures
 
 [2]
 
 had occurred on July 15. The pediatrician referred Bradley to a neurologist at the Medical Center Clinic in Pensacola. By letter dated July 23, 1984 the neurologist advised the pediatrician that he was uncertain whether these episodes were “infantile spasms”. On September 4, 1984 Bradley was admitted to Nemours Childrens Hospital, where he was treated and supervised by a neurologist, who has continued to treat Bradley to date. His diagnosis is that Bradley suffers from an encephalopathy
 
 [3]
 
 manifested by intractable myoclonic (muscle jerking) seizures, with a history of infantile spasms (jackknife seizures). The diagnosis is not disputed. Another neurologist, testifying as an expert before the special master, as will be discussed
 
 post,
 
 concluded with “reasonable medical certainty” that the vaccine was the cause.
 

 Bradley is now seven years old. His encephalopathy is manifested by psycho-motor retardation, seizures, and weakness in all four limbs. It is deemed permanent, with no expectation of recovery. He requires constant custodial care, and physical and speech therapy.
 

 The Compensation Proceedings
 

 A
 

 In November 1988 Gary Bunting filed a petition in the United States Claims Court on behalf of Bradley, for compensation under the National Childhood Vaccine Injury Act. The Act authorizes compensation for specified injuries, 42 U.S.C. § 300aa-10(a), including encephalopathy and residual seizure disorder, 42 U.S.C. § 300aa-14(a), when caused by a covered vaccine, 42 U.S.C. § 300aa-ll(c)(l).
 

 Compensation proceedings are conducted by a special master. 42 U.S.C. §§ 300aa-12(d)(1) and (3). The proceedings are designed to be informal and non-adversarial.
 
 See
 
 H.R.Rep. No. 908, 99th Cong., 2d Sess. 3,
 
 reprinted in
 
 1986 U.S.Code Cong. & AdmimNews 6287, 6344 (establishing a procedure to administer awards “quickly, easily, and with certainty and generosity”). Shortly after Bradley’s petition was filed, counsel for the Department of Health and Human Services (HHS) moved to suspend
 
 *870
 
 all proceedings for ninety days, and informed the Claims Court that HHS would not participate before the special master. HHS’s attorney of record moved to withdraw. The Claims Court denied this motion, observing that the statute requires decision within one year of filing of the petition, 42 U.S.C. § 300aa-12(d)(3), a schedule that would be difficult of compliance if the requested ninety-day suspension were granted.
 
 Bunting v. Secretary of the Dep’t of Health and Human Services,
 
 No. 88-48-V, slip op. at 6 (Cl.Ct. May 16, 1989) (order). The Claims Court later acknowledged the withdrawal of government counsel.
 

 Two days before the hearing in Miami, HHS delivered to the Claims Court in Washington a document entitled Vaccine Injury Compensation Program Medical Review (the Medical Review). The record is silent as to when or how this document was provided to the Buntings, but it is undisputed that it was not provided before or at the hearing. The special master later rejected this document as untimely.
 

 The hearing before the special master took place without representation of HHS.
 
 [4]
 
 The Buntings state that they were prejudiced and their costs were greatly increased by this absence of representation; that stipulations were unavailable of uncontested facts, undisputed evidence, and the admissibility of written reports; and that they were unable to narrow the issues by agreement, as the master’s pre-trial order required.
 

 During the hearing the parents and the medical expert Dr. Morrell testified in person, and deposition and documentary evidence were presented. The special master questioned the witnesses extensively. For example, the record contains sixteen pages of transcript wherein the master interrogated the medical expert. The master’s report contains twenty-three pages of findings of fact and conclusions of law. The master summarized his conclusion that causation had been shown by the preponderance of the evidence, as follows:
 

 The preponderance of the evidence in this case supports the finding that the petitioner has proven the elements required by the Vaccine Act, especially Section ll(c)(l)(C)(ii)(II). He accomplished this with persuasive and unrebutted expert testimony. The petitioner’s expert witness testified that the DPT vaccines Bradley received did cause Bradley’s injury and seizure disorder. There is no persuasive evidence to support a contrary finding. Dr. Morrell stated that his conclusion was not dependent upon the testimony of Bradley’s parents.
 

 The master referred to the absence of any other known cause of the injury:
 

 The medical records alone showed the vaccine was the only known cause of the injury Bradley has suffered. All other possible causes were ruled out.
 

 The master found that the pattern of symptoms the parents observed supported a finding of causation:
 

 The parents’ testimony also supports a finding that Bradley’s encephalopathy is vaccine-related. Under Section 14 the petitioner needed to show certain manifestations of the seizure disorder appeared as an onset of the encephalopathy within three days of the vaccination. Their testimony reported high pitched or unusual screaming and inconsolable crying, deep sleeping, staring episodes, rhythmical twitching, jackknife seizures, and unusual asymmetric hand usage. This pattern of symptoms began within three days of the first vaccination and recurred within three days of the second.
 
 *871
 
 It resulted in a diagnosis of an encephalopathy.
 

 B
 

 HHS requested
 
 de novo
 
 review by the Claims Court, on the basis that the special master erred in finding that Bradley’s injury was caused by the vaccine, and that the master’s failure to admit the Medical Review into evidence after the hearing was error. The Claims Court granted
 
 de novo
 
 review, admitted the Medical Review into evidence, and denied compensation.
 

 Bunting objects to the
 
 de novo
 
 review. However, at that time the Claims Court had statutory authority to redecide, on the record, any aspect of the decision of the special master, without deference to the findings or conclusions of the master. 42 U.S.C. § 300aa-12(d)(l) provided that “the [Claims] court shall undertake a review of the record of the proceedings and may thereafter make a de novo determination of any matter.”
 
 [5]
 
 We, in turn, review the Claims Court’s decision for correctness in law, and clear error in its factual findings.
 

 Bunting argues that the Claims Court erred in accepting the Medical Review into evidence. Bunting points out that although the Medical Review is dated June 12,1989, and thus was apparently available before and during the hearing before the special master on July 13, 1989, it was not produced, as required by the pretrial order of May 2, 1989.
 

 Bunting states that this withholding of the government’s evidence prejudiced his case because the medical expert Dr. Mor-rell was not able to address the contents of the Medical Review during his testimony before the special master. The Buntings state that their financial situation precluded calling Dr. Morrell to testify again before the Claims Court. Indeed, it is not clear whether such a procedure was available, for the Claims Court’s review was based entirely on the record before the master plus the Medical Review. There was no
 
 de novo
 
 evidentiary hearing.
 

 However, since the substance of the Medical Review does not defeat entitlement, as we shall discuss, and since the law authorizing
 
 de novo
 
 review has now been changed, we need not decide whether the Medica} Review should have been admitted by the Claims Court under these circumstances of its prior availability and failure of production. We shall review the Claims Court’s decision on its merits in light of all the evidence considered by the court.
 

 Proof of Causation
 

 A
 

 42 U.S.C. § 300aa-ll(c)(l) states the requirements for compensation for a vaccine-related injury:
 

 (B) (i) if such person received a vaccine set forth in the Vaccine Injury Table— ... [and]
 

 (C) (i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the [covered] vaccine ... or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or
 

 * * * * * *
 

 (ii)(II) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset or significant aggravation of which did not occur within the time period set forth in the Table but which was caused by a [covered] vac-cine____
 

 When the time period set in the Vaccine Injury Table for the first symptom or man
 
 *872
 
 ifestation of a specified injury is met, it is presumed that the vaccine caused the injury. 42 U.S.C. § 300aa-ll(c)(l)(C)(i). If this time period is not met, causation must be established by a preponderance of the evidence as a whole. 42 U.S.C. §§ 300aa-ll(c)(l)(C)(ii)(II), -13(a)(1). The Table period for encephalopathy or residual seizure disorder is three days after vaccine administration. 42 U.S.C. §§ 300aa-14(a)(1)(B) and (D). The legislative history explains:
 

 The Committee does not intend, however, to suggest that variance from the Table should act as a presumption against the petitioner but rather only that such a petitioner is not to be deemed to be eligible for compensation without further showings of causation.
 

 H.R.Rep. No. 908, 99th Cong., 2d Sess. 15,
 
 reprinted in
 
 1986 U.S.Code Cong. & Admin.News 6344, 6356. Substantiating medical evidence is required:
 

 The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.
 

 42 U.S.C. § 300aa-13(a)(l).
 

 B
 

 It is undisputed that Bradley suffers from an encephalopathy. The hearing record contains Dr. Morrell’s testimony that the physician and hospital records placed Bradley’s symptoms and diagnosis in medically recognized chronology to the administration of the vaccine. He testified with respect to the symptoms described by the parents or in the contemporaneous medical records, and that the symptoms were consistent with the diagnosis of encephalopathy. He identified known alternative causes of encephalopathy such as tuberculosis, prenatal abnormalities, and various causes of cerebral palsy, and testified that the medical records showed that tests for these causes were negative. He concluded that the cause of the encephalopathy was the DPT vaccine, especially the second inoculation. He stated:
 

 And other tests that were done still lead to no other conclusion, in my opinion, than that he is one of the relatively few individuals who received this type of inoculation that have been documented to have an adverse effect with a resulting encephalopathy.
 

 In addition, the Nemours Childrens Hospital neurologist who treated Bradley testified by deposition as to the symptoms and diagnosis. He reported the extensive efforts to find a correctable cause:
 

 Q. Have you performed any other test to ascertain possible causation?
 

 A. We have basically looked for every correctable cause of an encephalopathy. The tests that we have performed have included measurement of amino acids in the blood stream, organic acids in the blood stream. We have looked for possible endocrine causes and all the testing we have done on Bradley has come back negative and I am unable to establish an etiologic cause for his encephalopathy.
 

 The Act also requires that there must not be a preponderance of evidence that the injury was caused by factors unrelated to the administration of the vaccine. 42 U.S.C. § 300aa-13(a)(l)(B). The Claims Court did not find that any such evidence was of record. The lack of evidence of other possible causes is also a factor to be weighed in determining causation due to the vaccine.
 
 Tinnerholm v. Parke, Davis & Co.,
 
 411 F.2d 48, 53 (2d Cir.1969) (“The trial court was also justified in finding and giving weight to the facts that Quadrigen [a DPT and polio vaccine] is capable of causing exactly the symptoms that occurred to the infant plaintiff and that no other apparent cause of these symptoms was ever brought to light.”)
 

 The master, interrogating Dr. Morrell, asked him to define “reasonable medical certainty” as applied to his conclusion that the vaccine was the cause of Bradley’s disorder:
 

 THE WITNESS: “Reasonable medical certainty,” to me, means that a search for other causes has been appropriate, diligent, and prudent and has failed to result in a competing cause or cause that would be more likely to have caused his symptomatology than the DPT inocula
 
 *873
 
 tions, especially bearing in mind the chronology or timing of the development of his disorder, and the fact that he was normal leading up to that time.
 

 That there was no evidence whatsoever for any abnormality, including trauma, toxicity, congenital perinatal or prenatal deficit prior to the time of the inoculations.
 

 And also bearing in mind that the nature of the reaction to both inoculations, culminating in signs of an encephalopathy and failure to thrive or to develop properly thereafter, are typical and classical for those reported cases in the large literature that has to do with the abnormalities arising as a result of DPT inoculation.
 

 Although the conclusions of a medical expert are not binding on the decision-maker, 42 U.S.C. § 300aa-13(b)(l);
 
 Sternberger v. United States,
 
 401 F.2d 1012, 1016, 185 Ct.Cl. 528 (1968), we discern no support for the Claims Court’s statement that Dr. Morrell’s testimony “at best is speculative”.
 

 The authors of the Medical Review agreed with the diagnosis of Bradley’s encephalopathy, and agreed that DPT vaccination has been a suspected cause, but characterized the association as “controversial”:
 

 This child’s course is typical of crypto-genic infantile spasms and myoclonic epilepsy which are due to a chronic, possibly progressive encephalopathy. His epilepsy is intractable, and the most recent evaluation shows characteristics of a Pervasive Developmental Disorder (Autism). The onset of this child’s epilepsy is unclear.
 

 ******
 

 Infantile spasms have been reported after both pertussis encephalitis and after DPT vaccination but the association is controversial since the usual age of immunizations in children coincides with the peak age at onset of infantile spasms. To date no controlled study has established a cause and effect relationship between the two events.
 

 Encephalopathy and seizure disorder are listed on the Injury Table of the statute.
 

 The association of the administration of the DPT vaccine with the onset of these illnesses is not negated by the Medical Review’s assertion of the absence of a “controlled study”. A petitioner’s burden is not to show a generalized “cause and effect relationship” with listed illnesses, but only to show causation in the particular case. The Medical Review, and the Claims Court, would place a different and greater burden on petitioners than was enacted by Congress.
 

 Dr. Morrell testified that Bradley’s symptoms are
 

 typical and classical for those reported cases in the large literature that has to do with the abnormalities arising as a result of DPT inoculation.
 

 He testified that parents are, since 1986, routinely warned of the symptoms associated with encephalopathy following immunization. The Medical Review, at best relying in broad brush on a “controversial” slate of medical knowledge, does not suggest an alternative cause in Bradley’s case, or suggest any inconsistency in the observed symptoms, or error in this particular diagnosis.
 

 The standard of proof required by the Act is simple preponderance of evidence; not scientific certainty. As in
 
 Tinnerholm v. Parke Davis & Co.,
 
 285 F.Supp. 432, 440 (S.D.N.Y.1968),
 
 aff'd,
 
 411 F.2d 48 (2d Cir.1969), “[i]t is not plaintiff’s burden to disprove every possible ground of causation suggested by defendant nor must the findings of the Court meet the standards of the laboratorian”.
 

 The Claims Court found that causation had not been shown. We deem this finding to be in clear error. Bunting has met the statutory burdens, and is entitled to compensation in accordance with the Act.
 

 Costs
 

 Costs under Federal Circuit Rule 39 are taxed in favor of Bunting.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . A Table Injury is an injury, disability, illness, or condition listed on the Vaccine Injury Table, 42 U.S.C. § 300aa-14(a).
 

 [2]
 

 . Afebrile seizures are seizures that occur either •without an accompanying fever, or with an accompanying fever of less than 102 degrees. 42 U.S.C. § 300aa-14(b)(2)(B).
 

 [3]
 

 . An encephalopathy is defined as an abnormality, injury, or impairment of brain function. Signs or symptoms include high pitched and unusual screaming or persistent, inconsolable crying. An encephalopathy usually is characterized by slow wave activity on an EEG. 42 U.S.C. § 300aa-14(b)(3)(A).
 

 [4]
 

 . In
 
 Brown
 
 v.
 
 Secretary, Dep’t of Health and Human Services,
 
 920 F.2d 918, 919-20 (Fed.Cir. 1990) this court held that the absence of HHS from the hearing before the master was not, of itself, a basis for finding prejudicial error, with respect to the version of the Act then in effect and here applicable. Congress subsequently amended the Act, and in H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 513,
 
 reprinted in
 
 1989 U.S.Code Cong. & Admin.News 3018, 3116, Congress explained its amendments with the observation that:
 

 Respondents have withheld sufficient personnel and administrative support and mounted defenses incompatible with a no-fault system of compensation.
 

 The actions of HHS herein are illustrative of this criticism.
 

 [5]
 

 . The Act was amended in 1989 to eliminate the authorization of
 
 de novo
 
 review by the Claims Court, and the Claims Court now applies the "arbitrary or capricious" standard in its review of the master’s decision. 42 U.S.C. § 300aa-12(e)(2)(B). However, pursuant to Pub.L. No. 101-239 § 6601(s)(l)(B), this case remains governed by the Act in effect before the 1989 amendments.
 
 See
 
 42 U.S.C.A. § 300aa-10 (historical and statutory notes).