**Sue SUMMAR and Lee Summar as Next Friends of Kevin Summar, a Minor, Petitioners,**

**v.**

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–415V.

United States Claims Court.

Oct. 31, 1991.

---

**9.** Hearing tr., p. 159.

**10.** Hearing tr., p. 31.

 

Michael G. McLaren, Memphis, Tenn., for petitioners.

Michael P. Milmoe, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

YOCK, Judge.

This vaccine case is before the Court on a motion for review, filed by petitioners August 2, 1991, challenging the Special Master's decision denying their claim for compensation. *Summar v. Secretary of the Dep't of Health and Human Services,* No. 90–415V, slip op., 1991 WL 133607 (Cl.Ct. July 3, 1991) (decision of Special Master).

Petitioners, Sue Summar and Lee Summar, filed a petition on behalf of their son, Kevin, for compensation under the National Vaccine Injury Compensation Program, *codified as amended* at 42 U.S.C.A. §§ 300aa–1 *et seq.* (West Supp.1991) (Vaccine Program). The Special Master denied their petition on the grounds that they failed to carry their burden of proof regarding the issue of whether the encephalopathy occurred within the three-day period specified in the Vaccine Program and/or, alternatively failed to show that the vaccine caused the child's injuries.

For the reasons stated herein, petitioners' motion for review is denied, and the decision of the Special Master is affirmed.

### Facts

Kevin was born on November 10, 1976, to petitioners Sue Summar and Lee Summar. He was healthy at birth and developed normally through his first winter and spring. On April 25, 1977, at the age of five months, Kevin received his third diphtheria, tetanus, and pertussis (DTP) immunization at the office of his pediatrician, Dr. W.W. Mason.

Kevin's mother testified that, after the DTP shot, Kevin began to cry in an unusual and intense way that she likened to high-pitched screaming. She was unable to console Kevin and testified that the unusual crying continued for several days. Along with the crying, Kevin developed a fever after the vaccination. This fever rose on the day of the shot, reached its height of 102 to 103 degrees the next day, and remained at 100 degrees for the next eight days.

On May 3, 1977, the eighth day after the DTP shot, Kevin's mother observed strange behavior by the child. She stated that Kevin went limp, his eyes rolled back in his head, and his arms moved over his head in a swimming movement. Alarmed by this, she called the pediatrician, Dr. Mason, to report the episode. Dr. Mason told her there was no reason Kevin should be having seizures and instructed her to watch him closely. The crying continued and Kevin seemed irritable. On May 8, 1977, Kevin's father observed another episode similar to the one five days earlier that had alarmed his wife. The parents contacted Dr. Mason and brought Kevin in to the doctor's office that morning where his mother observed another seizure. Kevin was admitted to the hospital around noon that day and began to suffer seizures with increasing frequency.

Kevin continued to experience seizures for several more months in 1977 before they finally began to subside. He is significantly delayed developmentally, and the onset of this developmental problem was at the time the seizures began.

Hearings were held on petitioners' claim on February 1, 1991, and May 2, 1991. At the hearings, petitioners' experts Dr. Geier, an obstetrical geneticist, and Dr. Thoman, a pediatrician and toxicologist, and Kevin's mother testified as to entitlement. Dr. Bodensteiner, a pediatric neurologist, testified for the respondent.

Petitioners sought to prove that the encephalopathy occurred within the Vaccine Program Injury Table requirement of three days and that the first seizure, which happened after the three-day period, was a manifestation of this earlier encephalopathy. Dr. Geier testified that Kevin's fever and high-pitched crying within three days of the vaccine were consistent with encephalopathy. However, due to the fact that the first seizure occurred eight days after the shot, he could not say with reasonable medical certainty that Kevin's injuries were caused by the DTP vaccination.

Dr. Thoman, petitioners' other expert, testified that, to a reasonable degree of medical certainty, "it is a probability that Kevin Summary [sic] suffered permanent encephalopathic changes, progressing to myoclonic seizures from the three DPTs * * *." He based his opinion on the fact that Kevin exhibited no problems previously, and that, within a short time after the shot, he had high-pitched screaming, fever, and difficulty sleeping. Dr. Thoman also testified that there was no evidence of an alternative cause for Kevin's injuries.

Respondent's expert, Dr. Bodensteiner, testified that, if there had been an acute encephalopathy within three days of the vaccination that left the child brain damaged, one would "expect the spasms to begin, not eight days, but perhaps eight weeks or 10 to 12 weeks after the insult had time to mature and ripen." Therefore, he could not say that the DTP shot was more likely than not the cause of an encephalopathy within the three days subsequent.

The Special Master gave a bench ruling at the end of the hearing on May 2, 1991. He stated that crying and fever, upon which Dr. Thoman based his opinion, were not sufficient to show an encephalopathy within three days. Instead, the Special Master felt that respondent's expert, Dr. Bodensteiner, was more persuasive in his view that one could not conclude that it was more likely than not that the encephalopathy occurred in the three-day span. In evaluating the conflicting expert testimony, the Special Master placed great emphasis on the fact that Dr. Bodensteiner was a neurologist and Dr. Thoman was not. The Special Master also held that the petitioners failed to show by a preponderance of the evidence that the DTP shot caused the seizure that occurred eight days later.

In his written decision, issued on July 3, 1991, the Special Master fleshed out the conclusions he expressed in his bench ruling. He accepted the testimony of Ms. Sue Summar regarding the crying and fever, but found Dr. Bodensteiner's opinion regarding timing of the encephalopathy and causation of the injury more persuasive than that of Dr. Thoman. Therefore, he found the petitioners were not entitled to an award under the Vaccine Program.

Petitioners' motion for review of the Special Master's decision contested only his finding on when the encephalopathy occurred. If he found it to be within three days of the DTP shot, it would qualify under the Vaccine Program Injury Table and causation would be presumed. Once outside this three-day period, petitioner has the heavier burden of proving the vaccination actually caused the injury. However, petitioners did not raise any objections regarding the Special Master's finding on direct causation of the encephalopathy by the DTP shot after the three-day time period. Therefore, we need only consider the Special Master's decision regarding encephalopathy within the table limit of three days and need not reach the issue of direct causation.

### Discussion

As noted by the Special Master in his opinion, it is undisputed that Kevin suffered an encephalopathy. The question then becomes whether the encephalopathy occurred within three days of the DTP shot or, if not within the three days, did the DTP shot in fact cause the brain injury. Unfortunately, the Special Master seemed to lose sight of the limited nature of the inquiry by focusing on whether the DTP shot can cause brain injury in any case.

■ While this may be a controversial question in the medical community, for this forum the question was already decided by Congress when it enacted the Vaccine Program. As noted in *Bunting v. Secretary of the Dep't of Health and Human Services*, 931 F.2d 867, 873 (Fed.Cir.1991),

> Encephalopathy and seizure disorder are listed on the Injury Table of the statute. The association of the administration of the DPT vaccine with the onset of these illnesses is not negated by the Medical Review's assertion of the absence of a "controlled study". A petitioner's burden is not to show a generalized "cause and effect relationship" with listed illnesses, but only to show causation in the particular case. The Medical Review, and the Claims Court, would place a dif-

ferent and greater burden on petitioners than was enacted by Congress.

Therefore, the Special Master's discussion on causation regarding the number of physicians who are willing to conclude that the DTP vaccine causes injury at all and the existence of case control studies on this topic was not appropriate to this forum based on the guides given in *Bunting*.

■ The proper burden for the petitioners is to show by a simple preponderance of the evidence that the encephalopathy occurred within three days of the vaccine or that the vaccine in fact caused the injury at any point in time. 42 U.S.C.A. § 300aa–13(a)(1)(A). This is a legal standard of proof, and, under it, the existence of a fact must be shown to be more probable than not. *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). It is not the higher burden of scientific certainty, *Bunting*, 931 F.2d at 873, which the Special Master seemed to be leaning towards in the section of his decision regarding causation. However, the Special Master was obviously aware of the preponderance of the evidence standard as shown by his reference to it in footnote 5 of his decision. While this Court believes he should have limited himself to a discussion of the merits of the case solely under this statutorily mandated standard, it appears that he did make findings that conform with the correct, legal standard. Based on these finding, we uphold his decision on entitlement.

This Court must uphold the Special Master's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 42 U.S.C.A. § 300aa–12(e)(2)(B). We cannot merely substitute our judgment for that of the decisionmaker. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This Court must determine whether the Special Master acted rationally by seeing if he considered all the relevant factors and made no clear error of judgment. If so, his decision should be affirmed. *Hyundai Elec. Indus. Co. v.*

*United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990).

█ Petitioners assert that the Special Master acted arbitrarily and capriciously in his decision to disregard the testimony of their expert, Dr. Thoman, pertaining to the onset of the encephalopathy within the three-day period after the third immunization. They reason that, because the Special Master said he accepted the mother's testimony at face value, they proved the Table injury by a preponderance of the evidence. According to petitioners, the fact that the Special Master found that Dr. Thoman based his opinion on flimsy evidence does not affect their position.

To discern the factors the Special Master was required to consider, we must again look to the Vaccine Program. The section of qualifications and aids to interpretation, 42 U.S.C.A. § 300aa–14(b)(3)(A), defines encephalopathy as "any significant acquired abnormality of, or injury to, or impairment of function of the brain" and states:

> Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

Petitioners aver that the mother's testimony established the symptoms of high-pitched screaming and inconsolable crying and that, because these symptoms are listed under the Vaccine Program, it was arbitrary and capricious for the Special Master to reject the conclusion of encephalopathy. A close reading of the statute, however, shows that these symptoms are compatible with, but not conclusive evidence of, encephalopathy.

As stated above, a petitioner must prove his claim by a preponderance of the evidence. However, the Vaccine Program states that the Special Master "may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C.A. § 300aa–13(a)(1)(B). Therefore, Ms. Sue Summar's testimony on these symptoms is not enough, by itself, to support entitlement. It must be supported by medical records or medical opinion. In his deliberations, the Special Master must consider all relevant medical and scientific evidence in the record, but any "diagnosis, conclusion, judgment, test result, report, or summary shall not be binding * * *." 42 U.S.C.A. § 300aa–13(b)(1)(B). These provisions require expert testimony but give the Special Master some latitude in disregarding it.

Therefore, the issue turns on the reasons that the Special Master gave for rejecting Dr. Thoman's opinion that was based upon these undisputed symptoms which are compatible with, but do not alone prove, encephalopathy. Petitioners rely on *Bunting* and *McClendon v. Secretary of the Dep't of Health and Human Services,* 23 Cl.Ct. 191 (1991), to support their assertion that the Special Master acted arbitrarily and capriciously in his treatment of expert testimony. Both cases hold that a special master cannot reject expert testimony without a reasonable basis. *Bunting,* 931 F.2d at 873, and *McClendon,* 23 Cl.Ct. at 199. Pointing to the Special Master's statements that Dr. Thoman was too eager to diagnose encephalopathy on flimsy evidence and that he was not even a neurologist, petitioners aver that this was not a reasonable basis under *Bunting* and *McClendon* for rejecting Dr. Thoman's conclusions. This might possibly be true except for the fact that the Special Master then continued on to say that "[i]n contrast, I found the testimony of the respondent's expert, Dr. Bodinsteiner [sic], a well-qualified pediatric neurologist, to be much more persuasive on this issue." This distinguishes the case at hand from both *Bunting* and *McClendon* wherein the

respondent did not present any credible evidence to rebut the testimony of the petitioners' experts. Therefore, this Court finds that the Special Master did have a reasonable basis for his decision not to accept the opinion of petitioners' expert, and that he stated his reasons with clarity.

While this Court may not have reached the same result as the Special Master reached, we cannot merely substitute our judgment for his when he has acted rationally by considering all the relevant factors and making no clear errors of judgment. Therefore, we do not find that the Special Master's decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. He met all the requirements of the Vaccine Program in the standard of proof he required, the factors he considered, and his evaluation of testimony, both lay and expert.

## CONCLUSION

As stated above, petitioners have not shown that the decision of the Special Master was arbitrary, capricious, or an abuse of discretion. Therefore, the petitioners' motion for review is denied, and the decision of the Special Master is affirmed.

*See* Appendix J of the Rules in regard to filing for attorneys' fees and costs.