Warren C. and Joyce **SHEPARD**, legal representatives of decedent, Carrie L. Shepard, Petitioners,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–889V.

United States Claims Court.

Feb. 19, 1992.

Stanley T. Kaleczyc, Helena, Mont., for petitioners.

Eleanor A. Barry, with whom were Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, John Lodge Euler, Asst. Director, and Charles R. Gross, Asst. Director, Washington, D.C., for respondent.

## OPINION

ANDEWELT, Judge.

In this action, petitioners, Warren C. and Joyce Shepard, seek compensation under the National Childhood Vaccine Compensation Act of 1986, as amended, 42 U.S.C. §§ 300aa–1, *et seq.* (the Vaccine Act), for the death of their daughter, Carrie Shepard. Carrie died on February 19 or 20, 1971, 83–90 hours after the administration of a DPT (diphtheria, pertussis, and tetanus) vaccination on February 16, 1971. Petitioners argue that they are entitled to compensation under the Vaccine Act for two reasons. First, petitioners contend that Carrie suffered an encephalopathy and/or a hypotonic-hyporesponsive episode (HHE), two conditions listed in the Vaccine Injury Table at 42 U.S.C. § 300aa–14, and that the onset of the first symptoms of these conditions occurred within the 72-hour statutory time period. Second, petitioners contend that, in any event, the administration of the vaccine was the proximate cause of Carrie's death.

In an October 11, 1991, decision, the special master denied the petition and concluded that there was not a preponderance of evidence supporting either theory of entitlement. Pursuant to 42 U.S.C. § 300aa–12(e), petitioners filed a motion in this court seeking review of the special master's decision. For the reasons set forth below, the special master's decision is affirmed.

## I.

Petitioner Joyce Shepard testified at length as to Carrie's health status prior to and after administration of the vaccine. The special master made detailed related findings. In brief, he found that Carrie was generally healthy prior to administration of the DPT vaccine. After administration of the vaccine, on February 16 and 17, there was no eventful change in Carrie's health status except that on the afternoon of February 17, a baby-sitter had to hold Carrie because she was "fretful and fussy." On February 18, Carrie was fussy in the afternoon, but her parents decided to take her along to a dinner party. At the party, Carrie looked pale compared to another baby who was present, was fussy and irritable, and vomited once. On the morning of February 19, Carrie's paleness had disappeared but she was quieter than usual and she became flushed. Carrie was not very responsive, but did not scream or shriek. She was "fretful and fussy" that evening and had difficulty going to sleep. Late that night, she fell asleep in her mother's bed, but when her mother awakened on the morning of February 20, Carrie was motionless. Carrie was taken to the hospital and pronounced dead on arrival. An autopsy was performed but apparently no report was filed. Carrie's death certificate listed the cause of death as both bronchial pneumonia and crib death.

Both petitioners and respondent presented medical expert testimony. Petitioners' expert, Dr. Mark E. Thoman, offered the opinion that Carrie's death was related to the DPT inoculation. He concluded that "Carrie suffered from a progressive encephalopathy which was enhanced and intertwined with a progressively debilitating HHE." Respondent's expert, Dr. Neil N. Litman, disagreed and testified that Carrie suffered neither an encephalopathy nor an HHE after administration of the DPT inoculation. Ultimately, the special master concluded:

> During her last days, Carrie was an unwell baby. She was not as responsive to her environment as usual. She was fussy and irritable. Three and one-half to four days after her DPT vaccination she died. Nonetheless, the undersigned is left with the conclusion that there is simply not a preponderance of the evidence that Carrie suffered an encephalopathy or an HHE. The totality of these symptoms does not rise to a preponderance.

*Shepard v. Secretary, HHS*, No. 90–889V, slip op. at 13, 1991 WL 220282 (Cl.Ct. Oct. 11, 1991). The special master based this ultimate conclusion on an application of the definitions of encephalopathy and HHE contained in 42 U.S.C. § 300aa–14(b), which is entitled "Qualifications and aids to interpretation." Encephalopathy is defined therein as follows:

> The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

42 U.S.C. § 300aa–14(b)(3)(A).

In concluding that petitioners had failed to meet their burden to show that Carrie suffered an encephalopathy, the special master stated: "There is no evidence of convulsions or changes of level of consciousness for 6 hours or more. There is no evidence of high pitched or unusual screaming, nor inconsolable crying, nor bulging fontanel." *Shepard*, slip op. at 12. As to the single episode of vomiting, the special master noted that Carrie's brother had suffered a single vomiting episode on that same day. The special master con-

cluded that he could not "reach a probability as to whether this single act [of vomiting] is an indicium of anything—an encephalopathy, an HHE, or a simple gastrointestinal tract disorder." *Id.* at 12.

Turning to the HHE, the statutory definition is as follows:

A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete, hemiplegia or hemiparesis[ ] ], loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

42 U.S.C. § 300aa–14(b)(1). In concluding that petitioners had failed to demonstrate that Carrie suffered an HHE, the special master stated:

There is no evidence as [to an HHE] in regard to muscle tone or paralysis. There is no evidence of depression of consciousness or loss of consciousness or prolonged sleeping with difficulty arousing.

There is evidence of pallor on the afternoon of the emesis. However, that pallor was gone by the next morning. The court cannot conclude that pallor at the time of emesis is untypical of that condition.

In regard to the statutory elements of cardiovascular or respiratory arrest, one must presume that these elements were *pari passu* to the act of death itself absent evidence to the contrary. I cannot conclude that death was a sequela thereof.

There is evidence of a decrease of responsiveness or alertness. Dr. Thoman seemed to find significance in Carrie's disinterest in nursing. Although Carrie wasn't interested in eating that afternoon, her nursing schedule remained pretty close to every four hours, and she continued to eat the same quantity of food including cereal and applesauce on that day according to Mrs. Shepard. The undersigned considers this as an infirm

indicium. Dr. Thoman also indicated that Carrie had an inability to focus or fix, to look around with the head. But Mrs. Shepard said that Carrie did follow her mother with her eyes although she was not as responsive to games with her siblings. I found the totality of this testimony less than persuasive in arriving at any finding by a preponderance.

Dr. Thoman indicated that the flushing of Carrie's face on the day prior to death can go along with the histamine sensitizing factors from the toxins in the pertussis vaccine. Nevertheless, whether that indeed happened is unclear from the record or Dr. Thoman's testimony.

*Shepard,* slip op. at 12–13 (citations omitted).

Turning to the issue of causation-in-fact, Dr. Thoman testified that the toxins in the DPT vaccine could cause a breakdown of the blood-brain barrier and thereby cause "neurological problems." He offered, *inter alia,* both an unpublished article he had written in support of this theory and an affidavit submitted in a different case by Dr. Arthur Clifford Zahalsky, an immunologist. The affidavit described the effects of the DPT toxins on the brain and the central nervous system. The special master found this evidence insufficient to demonstrate causation-in-fact.

## II.

Under the pertinent requirements of the Vaccine Act, petitioners have the burden to demonstrate by a preponderance of the evidence either that the DPT caused Carrie's death (42 U.S.C. §§ 300aa–13(a)(1)(A) and –11(c)(1)(C)(ii)) or that Carrie suffered an encephalopathy or an HHE and had the first onset within 72 hours of the vaccination (42 U.S.C. § 300aa–13(a)(1)(A) and –11(c)(1)(C)(i)). Under the Act, the special master has the initial responsibility to consider all petitions seeking compensation. The special master hears the evidence, evaluates the credibility of witnesses, and issues decisions based "on the record as a whole." 42 U.S.C. § 300aa–13(a)(1).

The role of the Claims Court is limited to reviewing the special master's decision and

the scope of that review is comparatively narrow. The court may set aside the special master's findings of fact or conclusions of law only if the court finds them "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B). In effect, the court may set aside the special master's findings of fact only where the special master committed what amounts to a "clear error." *Misasi v. Secretary, HHS,* 23 Cl.Ct. 322 (1991). Petitioners make three arguments for reversal, but ultimately, none is convincing.

### A.

■ Petitioners' first argument relates to the special master's conclusion that petitioners had failed to demonstrate by a preponderance of the evidence that Carrie suffered an encephalopathy or an HHE. Petitioners focus on Dr. Thoman's testimony concerning masking of medical symptoms. Dr. Thoman testified to the effect that when a patient is suffering from both an encephalopathy and an HHE, there is an overlap of symptoms and this overlap can result in the masking of symptoms that typically would be observed if only one of the conditions were present. As an example, Dr. Thoman indicated that irritability caused by an encephalopathy can mask the lethargy that would be characteristic of an HHE. Petitioners contend that Dr. Thoman's testimony with respect to the possible masking of symptoms was not rebutted and, therefore, the special master was obliged to adopt it, and, having adopted it, the special master in turn was obliged to find that Carrie suffered from both an encephalopathy and an HHE.

The special master addressed Dr. Thoman's testimony on the masking of symptoms, in part, as follows:

> Dr. Thoman continually presented his theory that the indicia of an encephalopathy and an HHE overlap and therefore may tend to cancel out each other's manifestations. In other words, the lack of firm indicia for an encephalopathy and/or an HHE is due to their mutually masking each other's indicia. No evi-

dence of the general acceptability of this theory by the medical community was presented. This theory is speculative at best.

*Shepard,* slip op. at 13 (citations omitted).

Reviewing "the record as a whole," the special master did not abuse his discretion in failing to award compensation in the face of Dr. Thoman's testimony concerning masking. First, Dr. Thoman did not present any evidence to support his opinion that masking of symptoms can occur. His own unpublished article does not mention masking and he did not testify as to any support for his theory in the medical or scientific community. Certainly, nothing in the statutory definitions of encephalopathy or HHE suggests that Congress anticipated that symptoms may be masked. Second, the special master appeared to express concern about Dr. Thoman's credibility. After reviewing Dr. Thoman's evolving testimony concerning the vomiting incident, the special master concluded: "The court is less than persuaded at this volteface of medical conclusion." *Id.* at 12. Assessments of credibility are particularly within the purview of the trier of fact and the reviewing courts must give appropriate deference to the trier's conclusions. *Hambsch v. Dep't of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986); *Hagmeyer v. Dep't of Treasury,* 757 F.2d 1281, 1284 (Fed.Cir. 1985).

Third, even assuming that masking is a sound theory, the fact that masking can occur does not mean that it necessarily always occurs. Dr. Thoman, in effect, invoked masking to explain away Carrie's failure to exhibit many of the symptoms listed in the statutory definitions of encephalopathy and HHE. But the mere absence of such symptoms certainly does not itself mean that masking necessarily occurred. Generally, an absence of symptoms would seem as readily explained by an absence of the underlying conditions. Indeed, in the course of his testimony during the September 5, 1991, evidentiary hearing, Dr. Thoman frequently discussed masking in general terms and stated that masking "can" or "may" occur. *See, e.g.,* Tr. at 68, 107–08, 114. But he did not

present any empirical evidence or even provide any convincing explanation to support his conclusion that masking did occur here and was the cause of the paucity of symptoms in Carrie's case.

Fourth, there is expert testimony in the record that refutes Dr. Thoman's ultimate conclusion. Dr. Litman was never asked about masking and, hence, the court does not know whether Dr. Litman believed that masking is a viable theory. But, in any event, Dr. Litman's testimony on the ultimate issue is clear and unequivocal. After considering the same symptoms as Dr. Thoman, Dr. Litman concluded that no encephalopathy or HHE had occurred.

While Dr. Thoman offered testimony as to the toxicity of the DPT vaccine, he did not directly contend that toxicity invariably leads to masking. When considering petitioners' contention that the DPT vaccine in fact caused Carrie's death, the special master addressed the toxicity testimony as follows:

> Causation-in-fact requires proof of a logical sequence of cause and effect backed by peer-reviewed reputable scientific and/or medical literature. *See, e.g., Strother v. Secretary of HHS*, 21 Cl.Ct. 365, 370 (1990), citing *Hasler v. United States*, 718 F.2d 202 (6th Cir.1983), *cert. denied*, 469 U.S. 817 [105 S.Ct. 84, 83 L.Ed.2d 31] (1984). Dr. Thoman's unpublished article ... does not rise to the requisites.... It has not been peer-reviewed. Dr. Zahalsky's affidavit in another case ... has likewise not been published or reviewed. Although fascinating, Dr. Thoman's unpublished theories on toxins were not sufficiently intertwined with the case at bar for the court to arrive at any conclusions. The undersigned found these exhibits and Dr. Thoman's testimony thereon to be singularly unpersuasive as to a supposed relationship between the toxins and Carrie's condition.

*Shepard*, slip op. at 13–14.

This approach cannot be said to be arbitrary or capricious. Just as the theoretical possibility that some symptoms can be masked does not mean that any of Carrie's symptoms necessarily were masked, the theoretical possibility that a DPT recipient can have a fatal toxic reaction does not mean that Carrie suffered a fatal toxic reaction. Petitioners failed to demonstrate such a clear nexus between Dr. Thoman's toxicity theory and Carrie's personal situation so as to render the special master's decision arbitrary or capricious. Again, Dr. Litman considered the same information and concluded that the DPT vaccine did not cause Carrie's death.

### B.

■ Petitioners' next argument entails an attack on Dr. Litman's credibility as an expert witness. Petitioners contend that Dr. Litman's testimony should be given limited weight, if not totally discounted, because his views were hostile to, and unalterably in conflict with, the purpose and goals of the Vaccine Act. While it is true that Dr. Litman expressed concern about the ultimate correctness of some of the assumptions behind the Vaccine Act, a disagreement with a medical premise that underlies the Vaccine Act would not *per se* disqualify Dr. Litman from testifying as to the proper application of the Act's terms as drafted. Indeed, Dr. Litman freely testified about a variety of his opinions and answered directly all questions asked. Among those opinions was his conclusion that Carrie had not suffered an encephalopathy or an HHE. As the trier of fact, the special master, not this court, was in the best position to evaluate whether Dr. Litman's testimony on the pertinent issues was in any way biased by his disagreement with medical premises underlying the Vaccine Act. *Hambsch*, 796 F.2d at 436; *Hagmeyer*, 757 F.2d at 1284.

In this regard, it should be stressed that Dr. Litman did not contend that the DPT vaccination cannot cause either an encephalopathy or an HHE. He simply disagreed with petitioners as to the likely medical effect of such DPT-induced conditions. For example, Dr. Litman testified that he, along with the majority of the medical community, believed that an HHE cannot result in death. But the wording of the

Vaccine Act does not indicate that Congress necessarily presumed that a vaccine-induced HHE could result in death. The special master heard both experts testify. He agreed with one but not the other. His decision in this regard would not appear arbitrary or capricious.

### C.

Next, in a closely related argument, petitioners fault the special master for adopting an overly mechanistic approach of matching symptoms with possible conditions. They criticize the special master for considering whether an HHE or an encephalopathy occurred in "isolation" instead of considering whether both occurred simultaneously. In addition, they criticize the special master for not focusing on the fact that the record indicates that Carrie was a healthy child prior to administration of the vaccination, that there was no alternative cause for her death established, and that there was uninterrupted progression from Carrie's vaccination through her illness to her death.

But petitioners' criticism is not well founded. The Vaccine Act determines the metes and bounds of petitioners' entitlement to compensation, and the special master's approach was fully consistent with the requirements of the Vaccine Act. In drafting the Vaccine Act, Congress had to articulate the precise circumstances that would give rise to an entitlement to compensation. Congress determined that compensation would be available if a petitioner could prove in fact that a vaccine caused injury or death. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii). But Congress did not limit compensation to situations where causation could be proved. Congress determined also to permit compensation where causation was not proved but where a petitioner could establish the onset of specified medical conditions within specified times after administration of a vaccine. *See* 42 U.S.C. §§ 300aa–14 and –11(c)(1)(C)(i). In creating this zone of compensation where causation need not be proved, Congress could have chosen to allow compensation whenever a child who is apparently healthy prior to vaccine administration dies within 90 hours of the vaccine administration and no alternative cause of death can be established. But Congress was not willing to go that far.

Instead, Congress required, in pertinent part, that the onset of specific conditions occur within specified periods of time. Congress further offered definitions of these conditions as "aids to interpretation." The special master applied the Vaccine Act as written. He determined that petitioners had failed to establish by a preponderance of the evidence that Carrie suffered the first manifestation of an encephalopathy or an HHE within 72 hours after administration of the vaccine. The special master did not ignore the possibility that Carrie could have suffered from *both* an encephalopathy and an HHE but merely searched for requisite proof as to *either*. The special master simply concluded that there was not a preponderance of evidence supporting the existence of either condition.

In sum, the special master was obliged to make his determination "on the record as a whole." 42 U.S.C. § 300aa–13(a)(1). Upon review of that record and the special master's determination, and given the limited and potentially ambiguous nature of the symptoms exhibited by Carrie during the 72–hour period after vaccine administration, this court cannot conclude that it was clear error for the special master to hold that petitioners had failed to demonstrate by a preponderance of the evidence either that Carrie suffered the onset of an encephalopathy or an HHE within 72 hours after vaccine administration or that the vaccine, in fact, caused Carrie's death.

### CONCLUSION

For the reasons set forth above, the special master's October 11, 1991, decision is affirmed and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.