**Richmond AEA and Theresa Aea, Parents and Next Friends of Stephen Aea, Petitioners,**

v.

**UNITED STATES, Respondent.**

**No. 90–568V.**

United States Claims Court.

Aug. 28, 1992.

---

Richard Gage and Robert T. Moxley, Cheyenne, Wyo., for petitioners.

Laura Radack, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

MOODY R. TIDWELL, III, Judge:

Under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act" or "Act"), *codified as amended at* 42 U.S.C. §§ 300aa–1 to 300aa–33 (1988 & Supp. I 1989), this matter comes before the court on motion for review of Chief Special Master Gary J. Golkiewicz's decision to dismiss petitioners' claim with prejudice. For the reasons stated below, the court affirms the decision of the Special Master.

## FACTS

Stephen Aea was born on June 13, 1981. During the early months of his life he had no significant health problems and began developing as a normal, healthy child. However, Stephen began experiencing health problems after receiving his first diphtheria, pertussis, and tetanus (DPT) shot on September 3, 1981. The day after the vaccination, he contracted a temperature of 100.4 degrees, refused to nurse, and slept for long periods. A physician diagnosed Stephen as having an upper respiratory infection and, attributing Stephen's symptoms to that disorder, administered Rondec DM. Approximately, one month later, on October 12, 1981, Stephen was admitted to a hospital emergency room with a complaint that he did not respond to visual stimuli. Emergency room records noted that Stephen's eyes and head deviated to the right, and that he had been taking Phenergan for cold-related congestion and fever. The deviations were attributed by

the attending doctor to "possible phenothiazine reactions" from the Phenergan, but later medical records described the event as a "probable seizure disorder."

Stephen was taken to the hospital twice prior to his second DPT vaccination: once with a cold, and once for an examination in which he was found to be in satisfactory condition. At the examination, the attending physician noted that Stephen had no feeding or sleeping problems, and was active and alert, followed light, reacted to noise, and rolled over. The second DPT vaccine was administered on October 24, 1981, and afterwards Stephen again exhibited unusually long sleeping patterns. He was again diagnosed as having upper respiratory infections. Although medical records confirmed that Stephen's appetite and activity soon returned to normal, Mrs. Aea testified that Stephen lost weight during that time. A December 16, 1981 examination showed Stephen to be small for his age. For approximately two weeks before the December 16, 1981 checkup, Stephen had experienced congestion and a runny nose.

Stephen still had a runny nose, and was taking Amoxicillin and Dimetapp, when he received his third DPT shot on December 29, 1981. The next day, Mrs. Aea found Stephen lying in a pool of vomit, limp and unresponsive. He was immediately taken to the hospital, but by the time a doctor examined him, approximately one hour later, he had completely recovered. The attending physician attributed the condition to a Dimetapp reaction. Almost three weeks later, on January 18, 1982, Stephen suffered a seizure. Mrs. Aea described her son as having his head turned to the left, eye lids twitching, all extremities shaking, and as being unresponsive and limp. Although medical records noted this to be Stephen's first seizure, they also indicated a renewed speculation over the nature of the October 12, 1981 incident when he appeared temporarily blind and unresponsive.

Stephen began experiencing an increasing number of seizures prior to his fourth and final DPT vaccination on February 10, 1983. At the time of the last shot, he was taking Phenobarbital, Dilantin, Diamoxin, and other anti-convulsant medications. Mrs. Aea testified that after the fourth inoculation Stephen began to walk differently, could not pronounce words as well, and began to have clusters of seizures, beginning with ten and increasing to as many as one hundred seizures in a twenty-four hour period. Medical records, however, do not document the onset of cluster seizures until April 1984, over a year after the last shot. Today, Stephen remains developmentally disabled and is enrolled in a special education class at his elementary school. He has a seizure disorder, the cause of which remains unknown.

On June 25, 1990, Richard and Theresa Aea filed a petition in this court before Chief Special Master Gary Golkiewicz for compensation on behalf of their son under the Vaccine Act. The petition was denied, and petitioners moved for review of that decision in this court on June 8, 1992. Petitioners requested review on the grounds that the Chief Special Master (1) "acted in an arbitrary and capricious manner in rejecting the unrebutted medical opinion of petitioners' expert," (2) "arbitrarily and capriciously decided that petitioners' expert was not credible," and (3) "arbitrarily and capriciously decided the case before trial, and wrote his opinion only to justify the bias and error of his decision."

## DISCUSSION

In reviewing the decision of a special master, this court has authority to "set aside any findings of fact or conclusion[s] of law ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). By the plain language of the statute *de novo* review of legal conclusions or factual findings is not appropriate. *Stotts v. Secretary of Dep't of Health & Human Servs.*, 23 Cl.Ct. 352, 358–61 (1991); *see Hines v. Secretary of Dep't of Health & Human Servs.*, 940 F.2d 1518, 1523–24 (Fed.Cir.1991); *Murphy v. Secretary of Dep't of Health & Human Servs.*, 23 Cl.Ct. 726, 729–30 (1991). " '[A]rbitrary and capricious' is a highly

deferential standard of review." *Hines*, 940 F.2d at 1528. A reviewing court may not substitute its own judgment for that of a special master if the special master has considered all relevant factors, and has made no clear error of judgment. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Hyundai Elecs. Indus. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Secretary of Dep't of Health & Human Servs.*, 21 Cl.Ct. 450, 451–52 (1990). Accordingly, this court must grant the Chief Special Master wide latitude in determining the propriety of his denying petitioners' claim.

■ For petitioners to recover under the Vaccine Act, a showing of causation must be established in one of two ways. Causation is presumed if petitioners support, with medical records or expert testimony, a claim of an injury listed on the Vaccine Injury Table (Table), 42 U.S.C. § 300aa–14(a), and show by a preponderance of the evidence that the injury occurred within the time period described by the Table. 42 U.S.C. § 300aa–13(a)(1)(A). If these requirements are met, petitioners will recover unless respondent alternatively shows by a preponderance of the evidence that the injury resulted from factors "unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa–13(a)(1)(B).

A second, more difficult method of recovery is to show actual causation. This method requires petitioners to prove by a preponderance of evidence that a vaccine caused the alleged injury. Compensation for non-Table injuries is authorized under 42 U.S.C. § 300aa–11(c)(1), and includes any "illness, disability, injury, or condition" not listed on the Table, or not meeting the Table's requirements. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I)–(II). To recover, scientific certainty that a vaccination caused an injury is not required. *Bunting v. Secretary of Dep't of Health & Human Servs.*, 931 F.2d 867, 873 (Fed.Cir.1991). If a reputable medical or scientific explanation is used to support a proposed theory of causation, a prima facie case will be established. *McClendon v. Secretary of Dep't of Health & Human Servs.*, 24 Cl.Ct. 329, 334 (1991) (quoting *Strother v. Secretary of Dep't of Health & Human Servs.*, 18 Cl.Ct. 816, 820 (1989)). The burden then shifts to the government to show by a preponderance that something other than the vaccine caused the reaction. *McClendon*, 24 Cl.Ct. at 334. Here, petitioners attempted to prove both a Table injury and actual causation.

I. Petitioners' First Objection.

■ Petitioners first argued that the Chief Special Master acted in an arbitrary and capricious manner by rejecting the unrebutted medical opinion of petitioners' expert, Mark Thoman, M.D. The Vaccine Act, however, makes clear that a special master is not bound by the opinion of expert witnesses. 42 U.S.C. § 300aa–13(b)(1). Though a special master cannot "reject expert testimony without a reasonable basis," *Summar v. Secretary of Dep't of Health & Human Servs.*, 24 Cl.Ct. 440, 444 (1991); *see Bunting*, 931 F.2d at 873, adequate grounds were present here for the rejection Dr. Thoman's testimony.

At the hearing before the Chief Special Master, Dr. Thoman, a pediatrician and clinical toxicologist, offered testimony that was contradictory and based on unreliable information. He initially wrote a report which did not ascribe a Table injury to either the first or second shots, but which did characterize the episode after the third shot as an encephalopathy. This was in line with his theory that Stephen suffered "repeated toxic insult to his central nervous system" whereby each successive inoculation created further damage. By the third vaccination, Stephen's central nervous system had sustained enough damage to create a Table injury, and the fourth shot significantly aggravated the condition. However, at trial, and in direct conflict with his written report, Dr. Thoman's testimony indicated that the changes in Stephen's weight and eating patterns after the first two shots constituted an encephalopathy as defined by the Vaccine Act. He then contradicted his own testimony by viti-

ating the possibility of a Table injury after the first two inoculations, and suggested instead that the episodes were reactions caused by Stephen's cold medication.

In testifying about the third DPT vaccination, Dr. Thoman's testimony was similarly contradictory. He opined that the events which occurred after Stephen's first two shots were not seizure-related because, if they were, the attending physicians "would have done at least a basic workup." Yet, Dr. Thoman was willing to characterize the episode after the third inoculation as ictal [1] despite the fact that the attending physicians were not concerned about the possibility of a seizure and did not perform the basic workup. This contradiction was further compounded by the fact that neither Dr. Thoman nor the attending physicians witnessed the alleged seizure, or knew how long Stephen was limp and unresponsive after the third shot.

The Chief Special Master found that Dr. Thoman's expert opinion was influenced to a significant degree by the unreliable testimony of Mrs. Aea. Her testimony was described as being "replete with expressions of uncertainty, generalizations and otherwise unclear statements with regard to the timing of the events in question." Because Mrs. Aea was unable to recall past events with reasonable accuracy, and since the correctness, completeness, and reliability of the medical records remained unchallenged, the Chief Special Master properly disregarded her testimony. To the degree Dr. Thoman's opinion was based on Mrs. Aea's recollection of the events, the Chief Special Master was obliged to disregard his testimony as well.

Given the contradictory and unreliable nature of Dr. Thoman's testimony, the Chief Special Master properly determined it to be of little weight and found that petitioners failed to meet their burden to show either a Table injury or actual causation. Accordingly, and properly so, the Chief Special Master did not require respondent to present its defense. Chief Special Mas-

ter Golkiewicz did not act arbitrarily and capriciously in rejecting the unrebutted opinion of petitioners' expert.

II. Petitioners' Second Objection.

The second reason for review voiced by petitioners was that the Chief Special Master arbitrarily and capriciously decided that petitioners' expert was not credible. Petitioners' argument was barren of a single seed of persuasive reasoning, and consequently fails. "Determining the ... credibility of the evidence is the special province of the trier of fact." *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982), *see Hagmeyer v. Department of Treasury,* 757 F.2d 1281, 1284 (Fed.Cir.1985); *Shepard v. Secretary of Dep't of Health & Human Servs.,* 25 Cl.Ct. 326, 331 (1992). Accordingly, credibility determinations are "virtually unreviewable." *Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed. Cir.1986). Here, the Chief Special Master had ample reason to consider Dr. Thoman unreliable.

As noted above, Dr. Thoman's testimony was contradictory, in direct conflict with the medical records, and based in part on unreliable information. He was not the attending physician at any time while Stephen was receiving medical care, nor did he witness the alleged seizure after the third DPT shot, nor was he aware how long the episode lasted. In addition, the Chief Special Master noted that, in the past, Dr. Thoman had demonstrated a "willingness to engage in highly speculative rediagnosing of injuries years after the fact." Though petitioners charged that the reference to Dr. Thoman's testimony in prior cases was a "vicious attack on Dr. Thoman as a 'hired gun,'" the Chief Special Master properly considered the propensity of Dr. Thoman to find Table injuries where other experts would not.

To establish actual causation, Dr. Thoman opined that Stephen's seizure disorder was caused by "repeated toxic insult to

---

1. Relating to or caused by a stroke or seizure. Steadman's Medical Dictionary 760 (25th ed. 1990).

[Stephen's] central nervous system"—a theory that was not supported by reputable scientific or medical evidence. *See Strother v. Secretary of Dep't of Health & Human Servs.*, 21 Cl.Ct. 365, 370 (1990) (citing *Hasler v. United States*, 718 F.2d 202, 205–06 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984)). As such, Dr. Thoman's theory warranted little weight if any. The Chief Special Master's findings in this regard were neither arbitrary nor capricious.

III. Petitioners' Third Objection.

■■■ Finally, petitioners argued that the Chief Special Master arbitrarily and capriciously decided the case before trial, and wrote his opinion only to justify the bias and error of his decision. Petitioners referred to the following comment made by the Chief Special Master at the close of the hearing: "In fact, I had, in essence, had something drafted up to give it to you. I will give it to you today or it may be better that I draft the opinion, giving [*sic*] the amount of testimony and evidence that was produced today." The court can infer nothing from this quote except that the Chief Special Master was thoroughly prepared for the case before the hearing began. After the hearing, and in light of the additional testimony, the Chief Special Master wrote his final opinion.

In a similar argument, petitioners objected to the Chief Special Master's comment to Dr. Thoman: "I know what type of case you're going to put on, quite frankly...." However, the Chief Special Master was familiar with Dr. Thoman's approach and testimony in prior cases, and could easily anticipate the tactic that Dr. Thoman would take in the present case. Dr. Thoman was not "viciously attacked" or prevented from testifying; rather his testimony was given the weight it deserved.

Petitioners also charged that the Chief Special Master used case law which arose after the hearing merely to justify his personal bias rather than to produce a just decision. However, the court does not agree. The fact that the Chief Special Master relied upon cases decided after the

March 1991 hearing to support his opinion does not indicate that he was attempting to "justify his personal bias." Rather it indicates that the Chief Special Master properly relied on the most recent cases to ensure a proper decision.

■ In sum, petitioners claimed that "the proceedings below were a sham" and that the Chief Special Master conducted the hearing in a "shameful atmosphere of impatience and condescension ... with ... subtle attacks on petitioners and their counsel," rising to the level of misconduct cited in *Rosa v. Bowen*, 677 F.Supp. 782 (D.N.J.1988). Petitioners arguments, however, were feckless rhetoric. The conduct of the Chief Special Master simply did not approach the kind of judicial intolerance and prejudice that was condemned in *Rosa*. Moreover, the court cannot find any part the Chief Special Master's decision to be arbitrary or capricious.

CONCLUSION

Upon review of Chief Special Master Golkiewicz's order, and applicable case law, the court finds that petitioners have failed to demonstrate that the Chief Special Master was arbitrary, capricious, or abused his discretion in deciding that they were not entitled to compensation. For that reason, petitioners' motion for review is denied and the court, pursuant to 42 U.S.C. § 300aa–12(e)(2)(A), hereby affirms the Chief Special Master's May 8, 1992 decision. The Clerk of the court is directed to enter judgment accordingly.

IT IS SO ORDERED.