Larry L. MILLS and Mary Ann Mills, Individually and as Legal Representatives of the Estate of Kelly Ann Mills, Deceased, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICE, Respondent.

No. 90–460V.

United States Court of Federal Claims.

Jan. 26, 1993.

Michael R. McGown, Beaumont, TX, for petitioners.

Laura S. Radack, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, Torts Branch, John Lodge Euler, Deputy Director, and Charles R. Gross, Asst. Director, for respondent.

## OPINION

ROBINSON, Judge:

This matter was previously remanded to the special master to consider additional testimony from petitioner Larry Mills. In an addendum decision issued on February 20, 1992, Special Master Elizabeth Wright affirmed her earlier opinion that petitioners failed to demonstrate by a preponderance of the evidence that Kelly Ann Mills suffered an encephalopathy, hypotonic-hyporesponsive episode ("HHE" or "shock collapse"), and residual seizure disorder within three days of the administration of a diphtheria-tetanus-pertussis-polio (DTPP) vaccination on August 5, 1975. Petitioners move this court, pursuant to 42 U.S.C. § 300aa–12(e)(2), to find Special Master Wright's decision arbitrary and capricious.

*Procedural Background*

On May 30, 1990, petitioners filed an application for compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act" or the "Act"), 42 U.S.C. §§ 300aa–34 (1988), *amended by* several public laws (codified as amended at 42 U.S.C.A. §§ 300aa–1 to –300aa–34 (West Supp.1992)). On January 9, 1991, Special Master Wright presided over an evidentiary hearing on this matter. She allowed Mr. Mills, Kelly's father, to testify, but limited his testimony, excluding that which was merely cumulative of the testimony of Kelly's mother, Mary Ann Mills.[1] Subsequently, the special master conducted a continuation of the hearing, during which Dr. Ruth Atlas testified on behalf of petitioners, and Dr. Carter Snead testified on behalf of respondent.

After considering the evidence and testimony, Special Master Wright held that petitioners were not entitled to compensation, reasoning that they had failed to establish by a preponderance of evidence that Kelly sustained an encephalopathy, shock collapse, or residual seizure disorder within three days of the administration of the DTPP on August 5, 1975.

On July 8, 1991, petitioners moved the special master to reconsider her findings and conclusions. Alternatively, petitioners moved this court to review the special master's findings and conclusions. On December 9, 1991, this court granted petitioners' motion for review, ordering that Mr. Mills be allowed an opportunity to further testify about the events surrounding Kelly's injuries and tragic death.

On January 6, 1992, a second hearing was conducted by Special Master Wright, during which she heard additional testimony from Mr. Mills. On February 20, 1992, the special master filed her addendum decision on remand, affirming her prior denial of petitioners' claim. On August 20, 1992, this court entered an order allowing petitioners to file a supplemental motion for review, limited to consideration of Mr. Mills testimony from the January 6, 1992, proceeding and the special master's evaluation

---

1. Petitioners also introduced into evidence the expert testimony of Dr. Mark Geier.

of such testimony in relation to the evidence already in the record. In light of the supplemental record, this court holds that Special Master Wright's findings and conclusions in her addendum decision are neither arbitrary nor capricious, and that Mr. Mills's additional testimony fails to upset the special master's original conclusion that respondent should not bear liability for petitioners' dire loss.

### Factual Background [2]

During the limited evidentiary proceeding conducted on January 6, 1992, Mr. Mills related the following:

Mr. Mills had a professional relationship with Dr. Johnson, the pediatrician who cared for Kelly. Dr. Johnson told him that Kelly was a normal child at birth. R.T. of January 6, 1991, at 386.[3] In that regard, Mr. Mills denied knowing about the shivering episodes that occurred shortly after Kelly's birth, or that Kelly's physicians believed phenobarbital, an anti-convulsant, should have been considered for Kelly. R.T. at 388–89.

Mr. Mills further stated that, between June 1975 and August 5, 1975, Kelly was healthy and was never treated by a physician. R.T. at 392–95. On August 5, 1975, the date Kelly received her DTPP vaccination, Mr. Mills returned home from work between 5:30 and 6:00 p.m. to find Kelly thrashing violently and crying uncontrollably. He described her crying as high pitched, as if she were in pain. R.T. at 396–97. She was very active with her arms and legs, and would "somewhat tighten up" as if she were straining with a bowel movement; these movements culminated in Kelly arching her back. R.T. at 397. Mr. Mills had never seen her react this way. He estimated that this distressing behavior continued for a period of five hours. R.T. at 398.

At some point, Mr. and Mrs. Mills determined that Kelly also had a fever. As a result, Mrs. Mills called Dr. Johnson, who told her to take Kelly to the emergency room if the crying did not cease within an hour or so. R.T. at 402. A short time after having been given Tylenol, Kelly stopped crying and went to sleep. R.T. at 403–04. Mr. Mills stated that neither he nor his wife noticed any change in Kelly's pallor, given the darkness of her bedroom; a noticeable change in pallor is one of the most striking signs of shock collapse. R.T. at 404.

Kelly was still sleeping when Mr. Mills left for work the next morning. Later, Mrs. Mills informed him by telephone that Kelly was inactive and uninterested in eating. R.T. at 405. That night Mr. Mills observed Kelly's inactivity and unresponsiveness. R.T. at 406. He recalled that she made no eye contact that evening. *Id.*

A day or so later, Mrs. Mills went out in the evening for 45 minutes while Mr. Mills watched Kelly. During this period, Mr. Mills stated that he saw Kelly's eyes twitch for the first time. R.T. at 410. Mr. Mills stressed that he has an excellent memory, which is why he could remember the date of onset of Kelly's eye-twitching. *Id.*

Mrs. Mills took Kelly to see Dr. Johnson on August 9, 1975. Dr. Johnson treated Kelly for thrush. Mr. Mills was not present; therefore, he could not relate whether his wife told the doctor of the eye-twitching he observed previously. Mr. Mills stated further that sometime after the 9th of August, Kelly's eye-twitching progressively worsened. R.T. at 410–11.

On August 15 or 16, 1975, Mr. Mills observed, for the first time, Kelly experience a full-blown seizure. Kelly suddenly raised her arms, stiffened her legs, and cried with her chin quivering. Mr. Mills stated that he was certain of the date, give or take one or two days. R.T. at 420. He later admitted, however, that "what I know now or have subsequently observed as a much more involved and recognized seizure with all of the things including the eye

---

**2.** The facts of this matter are repeated in this Opinion only to the extent necessary to understand this court's analysis. For a more detailed factual background, see this court's earlier Opinion in this matter filed on December 9, 1991.

**3.** "R.T." is the reporter's transcript of the proceeding.

rolling, was between August 20 and August 29." R.T. at 440–41. This admission corresponds with Dr. Johnson's records of August 20, 1975, mentioning only—and for the first time—that Kelly was experiencing twitching of her eyes.

Both petitioners' experts and respondent's experts agreed during the proceedings before the special master that the onset of Kelly's seizures was the crucial event in determining when Kelly's encephalopathy and seizure disorder began. Petitioners' expert, Dr. Atlas, testified that the initial arching of Kelly's back, along with the eye-twitching, were the two most important events in her determination that Kelly suffered both an encephalopathy and residual seizure disorder within three days of the inoculation. On the other hand, respondent's expert, Dr. Snead, stated that Kelly's behavior, which culminated in her arching her back, was more suggestive of a "hyperirritable child" than of seizures. As a result, Special Master Wright focused on the advent of the eye-twitching.

With regard to shock collapse, the special master focused on evidence relating to Kelly's pallor after the inoculation.

### Contentions of the Parties

Petitioners contend that Special Master Wright's decision was arbitrary and capricious, and thus it should be reversed with full compensation being granted. Petitioners request that the special master's findings be set aside for the following reasons:

1.  Some of the special master's findings regarding the accuracy of Mr. Mills's testimony were blatant mischaracterizations of his testimony;

2.  The special master arbitrarily concluded that Mr. Mills's testimony could not be credited, despite the fact that his testimony was corroborated by uncontroverted medical records; and

3.  The special master arbitrarily concluded that Mr. Mills's testimony could not be credited, even though his testimony was corroborated by Mrs. Mills's uncontroverted testimony.

Petitioners further claim that the special master acted arbitrarily and capriciously in the following manners:

1.  The special master acted as a prosecutor rather than a jurist, by cross-examining Mr. Mills more vigorously than respondent's counsel; and

2.  The special master took a "results oriented" stance, evidenced in her addendum decision where she discredited Dr. Geier's testimony, not by pointing to contrary evidence on record in this case, but rather by pointing to expert testimony from other cases.

Respondent contends that Mr. Mills's testimony added little to Mrs. Mills's prior testimony. Therefore, respondent concludes, petitioners have failed their burden of establishing, by a preponderance of the evidence, that Kelly sustained the onset of an encephalopathy, shock collapse, or residual seizure disorder within three days of the administration of the DTPP.

### DISCUSSION

Pursuant to 42 U.S.C. § 300aa–12(e)(2)(B), this court may set aside a special master's findings of fact or conclusions of law only if it finds them "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." A special master's findings and conclusions must be reasonably supported by the record. *See Munn v. Secretary of HHS*, 21 Cl.Ct. 345, 348 (1990). This court may not, therefore, substitute its own judgment for that of a special master merely because it would have reached a different result based on the same evidence. When a special master considers the relevant evidence in the record, draws plausible inferences, and presents a rational basis for his or her decisions, there is little, if any, room for a finding of abuse of discretion. *See Hines v. Secretary of HHS*, 940 F.2d 1518, 1527–28 (Fed.Cir.1991).

Focusing on petitioners' first contention, this court fails to find that any of the special master's findings or conclusions, regarding the testimony of Mr. Mills, are blatant mischaracterizations of the record. This matter involves events that oc-

curred over 15 years ago. Unfortunately, petitioners' rendition of the sequence of such events relies more on the memories of those involved at the time than on tangible, demonstrative evidence. This court finds that Special Master Wright properly considered Mr. Mills's ability to remember the timing and sequence of Kelly's symptoms. This court also finds, in particular, that the special master's decisions to focus on the advent of Kelly's eye-twitching and evidence of her pallor after the inoculation to be well-reasoned.

As stated above, Mr. Mills initially testified that he first observed Kelly experience a full-blown seizure on August 15 or 16, 1975. He admitted later, however, that he first observed such a seizure at least four or five days afterwards, between August 20 and August 29. The special master inferred that this change in testimony was prompted by Mr. Mills's realization that Dr. Johnson's records of August 20, 1975, mention only Kelly's eye-twitching. This court is convinced that Special Master Wright reasonably concluded that she could not rely confidently on Mr. Mills's testimony concerning the onset of Kelly's full-blown seizures.

The special master was also understandably reluctant to rely on Mr. Mills's recollection concerning the onset of such an innocuous event as Kelly's eye-twitching. Though Mr. Mills may never have changed his testimony concerning the onset of Kelly's eye-twitching, this court is satisfied that Special Master Wright was justified in discounting his assertion. Dr. Johnson's records of August 20, 1975, nearly two weeks after Mr. Mills claims the symptom first appeared, contain the earliest documented account of the eye-twitching; the records state that the symptom first appeared three or four days prior to Kelly's examination. The special master's conclusion "that it is not possible to say there is a preponderance of evidence that Kelly's eye[-]twitching actually began within the three days of her August 5, 1975[,] inoculation" is reasonable in light of the record, including Mr. Mills's additional testimony.

Petitioners' second and third contentions challenge the special master's assessment of Mr. Mills's credibility. Specifically, petitioners argue that Kelly's medical records and Mrs. Mills's testimony each corroborate Mr. Mills's testimony. Therefore, petitioners urge, the special master should have given more credence to Mr. Mills's testimony.

Special Master Wright found little evidence in the medical records that substantiates Mr. Mills's testimony regarding the onset of Kelly's eye-twitching or shock collapse. This court, after carefully reviewing the record, finds no abuse of discretion in the special master's findings or conclusions. As noted above, the first written account of the eye-twitching in medical records is nearly two weeks *after* Kelly's inoculation. In addition, the observations of Dr. Johnson on August 9, 1975, *five* days after the vaccination, fail to mention the eye-twitching. Finally, the medical records are inconclusive, at best, as to the onset of shock collapse.

With respect to petitioners' contention that the special master should have given greater credence to Mr. Mills's testimony, in light of Mrs. Mills's corroborating testimony, this court must again find against petitioners. The special master's findings and conclusions do not state that she found Mrs. Mills credible and Mr. Mills incredible. Rather, she concluded that "it is clear ... that Mr. and Mrs. Mills are both convinced that the DTPP vaccination Kelly received caused her injuries and subsequent death." As Special Master Wright points out, however, a strong belief, no matter how sincerely held, is insufficient to entitle petitioners to compensation. The mere fact that the testimonies of Mr. Mills and Mrs. Mills corroborate each other does not, in itself, make either significantly more credible. The special master was justified in limiting the weight she gave Mr. Mills's testimony.

Petitioners' fourth contention is that the special master improperly acted as a prosecutor, rather than a neutral trier of facts, by cross-examining Mr. Mills more vigorously than respondent's counsel. This

court's review of the transcript of the January 6, 1992, hearing reveals nothing improper in the special master's conduct; indeed, Mr. Mills's testimony left this court asking many of the same questions asked by Special Master Wright.

■ That a special master is permitted to ask a witness questions is a glaring understatement. A special master is not only accorded broad discretion to investigate each petition before him or her, a special master also is obliged to vigorously and diligently investigate the factual elements necessary to determine the validity of a petitioner's claim. *See* 42 U.S.C. § 300aa–12(d)(2); H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1 at 17 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6355–58; Rule 8(e), Appendix J, R.C.F.C. Special Master Wright's questioning of Mr. Mills falls squarely within her duties and responsibilities as a special master.

Petitioners' last contention is that the special master arbitrarily and capriciously discredited Dr. Geier's testimony, not by pointing to contrary evidence in this case, but rather by pointing to expert testimony in other cases. This court finds no abuse of discretion.

■ The Vaccine Act clarifies that a special master is not bound by the opinion of expert witnesses. *See Aea v. United States*, 26 Cl.Ct. 878, 881 (1992). A special master may reject an expert's testimony when it is reasonable to do so. A reasonable basis includes those circumstances in which a special master finds one expert to be more persuasive than another. *See Summar v. Secretary of HHS*, 24 Cl.Ct. 440, 444–45 (1991). Further, regardless of this court's view of the appropriate weight to give to the testimony of witnesses, credibility decisions are uniquely within the purview of the special master and are "virtually unreviewable." *Hambsh v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir. 1986); *Griessenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985).

Petitioners focus solely on a statement by the special master, that "other than petitioners' expert, Dr. Mark Geier, an obstetrical geneticist, no expert who has ever testified before me has ever linked shock collapse with encephalopathy." Petitioners fail to take into account the context of this statement; that is, petitioners fail to recognize those portions of the immediate record that substantiate the special master's skepticism of a link between shock collapse and encephalopathy. Mr. Mills testified that neither he nor his wife noticed any change in Kelly's pallor the evening after she received the inoculation. Though Kelly appeared inactive and unresponsive the next evening, the special master inferred that if Kelly were in a state of shock collapse, Dr. Johnson would surely have diagnosed it on August 9, 1975. This inference is consistent with Dr. Snead's testimony that shock collapse is associated with "extreme pallor and limpness to the point of being ragdoll-like." It may also be that Kelly was inactive the day following the vaccination and the next few days due to exhaustion from her distressing period of crying and the onset of thrush, for which Dr. Johnson treated her on August 9, 1975. This court cannot find that the special master's consideration of Dr. Geier's testimony was either arbitrary or capricious.

The record in this matter is almost anything but certain with respect to the relevant issues; an unfortunate, but accurate characterization. Nevertheless, it is petitioners' burden to establish their case. While this court can only attempt to understand petitioners' loss, the mere occurrence of this tragedy and petitioners' sincere belief as to its cause neither justify a finding that the special master acted arbitrarily or capriciously, nor entitle petitioners to compensation from respondent. Special Master Wright articulated a rational basis for each of her findings and conclusions. This court finds, therefore, that Special Master Wright did not abuse her discretion in assessing Mr. Mills's testimony. The addendum decision on remand is affirmed.