**Robert WOODARD and Diane Woodard, Individually and as natural guardians of Kerri Woodard, a minor child, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–1303V.

United States Court of Federal Claims.

July 14, 1994.

Michael J. D'Arcangelo, Toledo, OH, for petitioners.

Aristia Karas, Washington, DC, for respondent, with whom were Asst. Atty. Gen. Frank W. Hunger; Helene M. Goldberg, Director, Torts Branch; John Lodge Euler, Deputy Director; and Gerard Fischer, Asst. Director.

## OPINION

ROBINSON, Judge:

This matter is before the court for review of Special Master Paul T. Baird's Decision, dated January 19, 1994, finding that petitioners Diane and Robert Woodard failed to demonstrate by a preponderance of the evidence that their daughter's infantile spasms had been significantly aggravated by a diphtheria-pertussis-tetanus (DPT) vaccine.

### Procedural History

On September 25, 1990, Mr. and Mrs. Woodard filed a petition for compensation under the National Childhood Vaccine Injury

Act,[1] or "the Act," alleging that their daughter, Kerri, had suffered a significant aggravation of her infantile spasms within three days after her second and third administrations of DPT vaccine.

The special master conducted an evidentiary hearing on November 24, 1992, for the sole purpose of receiving testimony from fact witnesses. Testimony was heard from both petitioners and from Terri Schaffer, Mrs. Woodard's sister. Following this hearing, the special master issued a Memorandum and Findings of Fact ("findings of fact") on January 28, 1993.

The special master conducted a second hearing on November 4, 1993, to take testimony from petitioners' and respondent's medical experts. After the second hearing, the special master filed his Decision denying compensation, *Woodard v. Secretary of HHS*, No. 90–1301V (Fed.Cl.Sp.Mstr. Jan. 19, 1994).

*Factual Background*

The special master's findings of fact, based on petitioners' exhibits and the testimony of fact witnesses,[2] can be summarized as follows:

Kerri Woodard is 13 years old and suffers from severe retardation.[3] She lives at home with her parents, but she cannot speak normally, is not potty-trained, and is unable to feed herself. *Woodard*, Findings of Fact at 4. The events in question all occurred during 1981, the year Kerri was born.

Kerri was born in Toledo, Ohio, on March 23, 1981. During her first three months, her parents testified, Kerri showed signs of normal development, and they described her as having been bright and alert. She received the first of three DPT shots on July 13 when she was nearly four months old, and she showed no adverse reactions to that shot.[4] Shortly after that first DPT shot in July, however, Kerri's parents testified that they observed her having spells or spasms which lasted a few seconds at a time. During these spells, Kerri would lift up her arms and heave a sigh. Over the course of the summer of 1981, Kerri also began to lose interest in toys and became less physically active. *Id.* Kerri's parents testified that Mrs. Woodard brought these problems to their pediatrician's attention when she brought Kerri in for her second DPT shot on August 31. According to the parents' testimony, the doctor told Mrs. Woodard that Kerri was probably suffering from an immature nervous system. The doctor administered the second DPT shot that day as scheduled. *Id.* The pediatrician's charts contain a record of the August 31 visit and the administration of the DPT shot, but contain no evidence of the alleged conversation concerning Kerri's spells or of the doctor's alleged diagnosis of an immature nervous system. *Id.;* see also Exhibit (Ex.) IV at 2.

When she came home after receiving her second shot, Kerri was tired, and she slept deeply for at least 16 hours. Her parents attempted to rouse her during the evening, but Kerri did not fully awaken until 7:30 the next morning, her normal wake-up time. That next day she behaved and ate normally. *Woodard*, Findings of Fact at 3.

In the weeks following her second shot, Kerri's parents observed that her development was regressing. She eventually ceased babbling and cooing, showed no interest in toys or other objects, ceased to roll over and

---

1. 42 U.S.C. §§ 300aa–1 to –34 (1988), *amended by* several public laws (codified as amended at 42 U.S.C.A. § 300aa–1 to –34 (West Supp.1994). For the sake of convenience, codified sections of the Act are cited herein without reference to "42 U.S.C. § 300aa."

2. The special master also based his findings of fact, in part, on depositions made by petitioners and Kerri's original pediatrician in connection with a civil suit which petitioners had filed against that doctor in the Lucas County, Ohio, Court of Common Pleas, *Woodard v. Roberts*, No. 88–2993. That suit was dismissed without preju-

dice in 1990, prior to the filing of petitioners' claim in this court.

3. For most children who have been diagnosed with infantile spasms, the spasms usually cease by age three. Nonetheless, a majority of such children remain developmentally retarded, even if their development was normal prior to the onset of the spasms. *See, e.g.*, John H. Menkes, *Textbook of Child Neurology*, pp. 621–23. (Lea & Febiger, 4th ed. 1990).

4. Petitioners do not make any aggravation claims with respect to the first shot.

became less alert. One night Mrs. Woodard heard Kerri make an unusual scream. *Id.* at 4.

Kerri received her third DPT shot on October 16. By this time, Kerri was having spasms three to five times per week. *Id.* At the evidentiary hearing, Mrs. Woodard testified that, during the October 16 visit, she again raised her concerns with Kerri's pediatrician. In addition to a notation about the DPT shot, the doctor's records of that visit contain notations that he observed "slow gross motor" activity, "poor reach," and possible hearing problems. Ex. IV at 3.

In the three days immediately following her third DPT shot, Kerri's periodic spasms continued without any change in frequency or severity. *Woodard,* Findings of Fact at 4. Her parents did not observe any other signs of trouble in those days, such as a fever. *Id.* However, Mrs. Woodard's sister, Terri Schaffer, testified that she observed an unusual seizure when she was babysitting Kerri on October 19. Mrs. Schaffer said that, during this episode, Kerri stiffened for a few seconds, and her eyes rolled back in her head. Although she had never observed Kerri having a similar seizure before, Mrs. Schaffer admitted that she did not report the incident to Kerri's parents, believing that they were already aware of Kerri's condition.[5] *Id.*

The next day, October 20, Kerri's mother observed another dramatic seizure. Again, Kerri stiffened, her eyes rolled back in her head, and she drooled uncontrollably. Kerri eventually recovered, but Mrs. Woodard was frightened by the incident and called Kerri's doctor, who told her to bring Kerri to his office the next day. *Id.*

Because Mrs. Woodard had to work on October 21, Mr. Woodard and Mrs. Schaffer took Kerri to the doctor's office that day. After an examination, the doctor admitted Kerri to the Toledo Hospital. The notations in Kerri's chart of that visit to her pediatrician report: "[D]ad describes seizure-like [symptoms] stiffens ... rolls eyes [times]

several weeks." *Woodard,* Findings of Fact at 5.

Kerri was hospitalized for about two weeks. The doctors performed a battery of tests and observed Kerri suffering several more seizures similar to the one observed by Mrs. Woodard on October 20. They diagnosed Kerri as having infantile spasms. *Id.* at 6.

Kerri's hospital admission records contain information which in many respects illuminates the testimony given by Mr. and Mrs. Woodard 11 years later at their hearing before the special master. There are two sets of notes describing Kerri's case: a "History and Physical" report taken on October 21, Ex. VI at 4, indicating the source of the information was Kerri's parents; and a "Consultation" report, Ex. VI at 8, written on October 24, by the neurologist who treated Kerri. *See also Woodard,* Findings of Fact at 5.

The History report recounts the eye-rolling episode of October 20, as the "worst" one Kerri's parents had yet observed, as well as the apparent abnormalities in Kerri's development. The History report also indicates that Kerri's parents first began noticing her seizures about three weeks prior to October 21, while the Consultation report states that they were first observed about a month before October 24. Both records state that, since in the time Mr. and Mrs. Woodard first noticed Kerri's seizures, they had increased in frequency from a few times per week to "almost daily" (in the History report) or "several times a day" (in the Consultation report).

Although these hospital records generally corroborated petitioners' account of Kerri's October 20 seizure episode and of Kerri's developmental problems, the records also raised important factual issues. Most significantly, these records contradicted Mr. and Mrs. Woodard's testimony as to when Kerri first began to show signs of developmental abnormality, as well as their testimony as to

---

5. In his findings of fact, the special master concluded only that Mrs. Schaffer "may" have observed a seizure episode as she described on October 19. The court interprets the special master's choice of words as an indication that he did not find Mrs. Shaffer's testimony entirely convincing.

when they first began noticing a change in the intensity and frequency of Kerri's spasms. According to the hospital records, Kerri's development ceased to progress normally after she was three months old, i.e., after about June 23, three weeks prior to her first DPT shot. Ex. VI at 4 and 8. Her condition took a dramatic turn for the worse at the end of September or beginning of October, about three or four weeks after her second DPT shot and before her third. *Id.* Kerri's steady regression culminated in the October 20 eye-rolling episode. By contrast, Mrs. Woodard testified before the special master that Kerri's developmental problems and seizures began after her first DPT shot, when Kerri was four months old. *Woodard,* Findings of Fact at 3. Mrs. Woodard also testified that she reported Kerri's spasms to her pediatrician when she took Kerri in for her second shot on August 31. *Id.* August 31 was about a month earlier than the hospital records indicate that Mr. and Mrs. Woodard first observed the spasms. Woodard went so far in his testimony as to call the hospital records incorrect in some respects. *Id.* at 7.

Relying on *Murphy v. Secretary of HHS,* 23 Cl.Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed.Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 463; 121 L.Ed.2d 371 (1992), and the authorities cited therein, the special master gave substantially more weight to the contemporaneous written hospital records than to petitioner's oral testimony concerning the same events. The special master concluded that the History and Consultation reports were "generally consistent in the facts they record," and since the typewritten notes were based on statements given to the doctors by petitioners themselves, they were more reliable than petitioners' oral testimony. *Id.* at 7–8.

### Contentions of the Parties

Petitioners argue that the special master erred:

1. By requiring petitioners to demonstrate that scientific research supports their contention that the pertussis vaccine can aggravate infantile spasms;

2. By accepting respondent's expert testimony opining that Kerri's condition had an underlying cause, after the special master had already concluded in his findings of fact that Kerri's spasms were cryptogenic in nature, rather than accepting the opinion of petitioners' expert witness;

3. By failing to recognize the distinction between cryptogenic and symptomatic infantile spasms; and

4. By not relying on petitioners' expert testimony that the administration of the second and third DPT vaccinations was contrary to the standards of the American Academy of Pediatrics.

Respondent counters that the special master properly concluded that Kerri's spasms were not aggravated by the DPT vaccine outside of the three-day Table period. Further, respondent argues that petitioners' claim that the special master incorrectly relied upon the testimony of respondent's expert witness is without merit, and that the special master correctly distinguished between cryptogenic and symptomatic infantile spasms.

### DISCUSSION

#### A. *Standard of Review.*

Under § 12 of the Act, this court may set aside a special master's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." A special master's findings and conclusions must be reasonably supported by the record. *See Munn v. Secretary of HHS,* 21 Cl.Ct. 345, 348 (1990), aff'd, 970 F.2d 863 (Fed.Cir.1992). This court may not, therefore, substitute its own judgment for that of the special master merely because it would have reached a different result based on the same evidence. When the special master considers the relevant evidence in the record, draws plausible inferences, and presents a rational basis for his or her decisions, there is little, if any, room for a finding of abuse of discretion. *See Hines v. Secretary of HHS,* 940 F.2d 1518, 1527–28 (Fed. Cir.1991).

### B. *Table vs. Non–Table Injury or Aggravation.*

■ Under § 13 of the Act, a petitioner may establish a table injury or aggravation by establishing three elements: first, that the petitioner received one of the covered childhood vaccines; second, that the petitioner subsequently died or suffered an illness, disability, injury, condition or an aggravation of a pre-existing condition; and, third, that the onset of the injury or aggravation occurred within the time period specified in the Table under § 14. Once these three elements of a table injury are demonstrated, the court must presume that the vaccine caused the injury or aggravation. The Secretary may rebut the presumption, however, by a preponderance of evidence that the injury or aggravation was caused by factors unrelated to the administration of the vaccine. § 13(a)(1); *see also* § 11(c)(1).

■ While the Act substantially relieves petitioners of the burden of proving causation in the case of table injury, petitioners must still demonstrate those three basic elements described above. This burden includes proving the fact of the injury or aggravation by a preponderance of the evidence. § 13(a)(1)(A).

■ When a petitioner alleges a non-table injury or aggravation, *e.g.,* an injury or aggravation which is listed in the Table, but has manifested itself outside of the time limits specified therein, the petitioner must also prove causation by a preponderance of the evidence. In such a case, "petitioners must show a medical theory causally connecting the vaccination and the injury."[6] *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir. 1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984), *quoted with approval in Grant v. Secretary of HHS,* 956 F.2d 1144, 1148 (Fed.Cir.1992).

With regard to the DPT vaccine, the Table lists several adverse reactions, but the pertinent ones to this case are "encephalopathy (or encephalitis)" and "residual seizure disorder," either of which might encompass Kerri's symptoms.[7] With regard to either encephalopathy or residual seizure disorder, the Table also specifies that the first symptom or manifestation of onset or significant aggravation must appear within three days after administration of the vaccine. § 14(a). The Act defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health."[8] Section 33(4).

### C. *Analysis.*

#### I.

■ The special master first considered whether the evidence showed that Kerri had suffered a significant aggravation of her infantile spasms within three days of either her second or third DPT shot, and he concluded

---

6. To prove causation, petitioners have the same burden as they would have in a common-law vaccine tort case brought outside of the Act. *See Strother v. Secretary of HHS,* 21 Cl.Ct. 365, 369 (1990), *aff'd without op.,* 950 F.2d 731 (Fed.Cir. 1991).

7. The special master approached Kerri's infantile spasms as a "residual seizure disorder," but the record is otherwise ambiguous as to whether Kerri's infantile spasms should be classified as a residual seizure disorder or as an encephalopathy, both of which are neurological impairments which include spasms or convulsions among their symptoms. *See* § 14(b)(3).

The ambiguity in the record is not material to the disposition of the case by the special master or this court, which has previously awarded compensation to petitioners who have suffered from cryptogenic infantile spasms within the three-day Table period. *See Johnston v. Secretary of HHS,* 22 Cl.Ct. 75 (1990).

8. The legislative history clarifies Congress's intent in this regard:

The [Energy and Commerce] Committee has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and half weeks), but is meant to encompass serious deterioration (e.g., a child with monthly seizures who, after vaccination, has seizures on a daily basis).

H.R.Rep. No. 908, 99th Cong., 2d Sess. pt. 1 at 15–16, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6356–57.

that the evidence did not support a finding of a significant aggravation within the three-day table period. *Woodard,* Decision at 5. The special master decided that the eye-rolling episodes which may have been observed by Mrs. Schaffer on October 19, and which were indisputably observed by Mrs. Woodard on October 20—respectively, three and four days after Kerri's third shot—were merely more dramatic manifestations of Kerri's condition than had been previously observed. Those episodes did not, in the special master's view, represent a deterioration or significant aggravation of her condition. The special master based his conclusion on the testimony of both petitioners' and respondent's expert witnesses, who agreed that eye-rolling and drooling did not, by themselves, signify a worsening case of infantile spasms within the three-day table period. *Id.*

With respect to Kerri's second DPT shot on August 31, the only evidence in the record of an adverse reaction to it was petitioners' testimony that Kerri slept an unusually long time the night after getting the shot. Because the deep sleep was not accompanied by other signs of abnormality, and because Kerri woke at her normal time the next day, the special master concluded that the sleep did not indicate an injury or aggravation of her condition in connection with her second shot. *Woodard,* Findings of Fact at 8.

Having thus determined that petitioners failed to prove a table case with respect to either the second or third DPT shots, the special master next considered whether the evidence supported a conclusion that a injury or aggravation occurred outside of the three-day table period. *Woodard,* Decision at 5. Because such a case would require proof of causation supported by both factual and medical evidence, as discussed above, petitioners faced a heavy burden of proof once their case had failed to qualify as a table case.[9] The special master weighed the evidence of expert testimony and the medical literature

submitted by the parties and determined that, outside of the three-day table period, Kerri did not suffer a significant aggravation of her infantile spasms as a result of her second and third DPT shots. *Id.* at 6.

## II.

Petitioners insist, nonetheless, that they have established a table case and that the special master should not have required medical evidence to support the notion that DPT can cause a significant aggravation of infantile spasms. Petitioners are correct in that, had they established a table injury or aggravation, a medical or scientific connection between the injury and the vaccine would not have been necessary by application of § 13. Petitioners' argument misses its mark, however, because the special master sought scientific proof of causation in this case only after he determined that petitioners had failed to meet the requirements of the table.

When a petitioner fails to establish a table case, the special master, by virtue of his broad fact-finding authority under § 12(d)(3), may determine, *sua sponte,* whether the petitioner is eligible for compensation under the appropriate standards for non-table injuries. However, the law of *Grant,* which is binding on this court, requires the special master's decision in such a case to have a basis in medical science.[10] Accordingly, after determining that petitioners had failed to establish a table case, the special master heard testimony from the parties' medical experts on the question of whether an injury or aggravation had occurred outside of the table period.

The "aggravation" which petitioners allege is essentially that Kerri's chances of normal development were impaired by the administration of the second and third DPT shots of August 31, and October 16. Petitioners base this claim on the testimony of

9. Indeed, petitioners may have recognized this burden, because they never argued before the special master that Kerri's case involved a non-table injury or aggravation.

10. This conclusion is also supported by the legislative record: "Evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate actual causation for such a petitioner." H.R.Rep. No. 99–908, 99th Cong.2d Sess. pt. 1, at 15, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6356.

their expert witness, Dr. Harvey Bennett.[11] Dr. Bennett testified that Kerri, as a child with cryptogenic infantile spasms, would have had a 15 to 60 percent chance of normal mental development, if not for the introduction of pertussis vaccine into her system. *Woodard,* Decision at 2. Dr. Bennett also acknowledged, however, that early medical intervention is crucial to any hope of normal development, and that the 15 to 60 percent estimate was based on studies of children who had received early medical treatment. *Id.* at 3. Kerri, as Dr. Bennett also acknowledged, suffered infantile spasms for many weeks prior to her October 21 hospitalization and, thus, did not receive the timely treatment that would have increased the likelihood of subsequent normal development. The special master recognized the inconsistency between Dr. Bennett's admission regarding the lateness of Kerri's treatment and his opinion regarding the effect of the pertussis vaccine on her chances of normal development. Indeed, when the special master asked Dr. Bennett whether he would have been able to predict, with any medical certainty, the outcome of a child with Kerri's identical symptomatology as of the third DPT shot, Dr. Bennett admitted that he could not. *Id.* Accordingly, the special master gave little credit to Dr. Bennett's opinion regarding the effect of that shot on Kerri's chances of normal development.

Special Master Baird also noted that Dr. Bennett's testimony was even more dubious in light of his reliance on medical literature which did not support a causal link between pertussis vaccine and infantile spasms. *Id.* at 6. The doctor cited, as one of his principal sources, a report of the Institute of Medicine, *Adverse Effects of Pertussis and Rubella Vaccines* (National Academy Press, 1991). With regard to a connection between the vaccine and infantile spasms, the report reviewed a number of scientific studies and concluded: "The evidence does not indicate a causal relation between DPT vaccine or the pertussis component of DPT and infantile

spasms." *Id.* at 77. Thus, Dr. Bennett relied on medical literature which contradicted his own opinion regarding a link between DPT and Kerri's condition.

■ Although expert medical opinions are essential to helping the special master determine causation in a non-table case, the special master is not bound to follow the opinions of expert witnesses. § 13(b)(1). A special master may even reject an expert's testimony when it is reasonable to do so. *Mills v. Secretary of HHS,* 27 Fed.Cl. 573, 578 (1993). In the present case, because of the inconsistencies in Dr. Bennett's testimony, the court concludes that the special master was reasonable in finding that "Dr. Lockman's opinion on causation appears to be much more consistent with what the scientific studies show about the prognosis for victims of cryptogenic infantile spasms than that of Dr. Bennett." *Woodard,* Decision at 6.

### III.

The discrepancies in Dr. Bennett's testimony also belie petitioners' third contention—the special master erroneously ignored the distinction between cryptogenic infantile spasms, of which there is either no underlying cause or of which the underlying cause is not known, and symptomatic infantile spasms, which are secondary to a known neurological disorder. The distinction is important, petitioners argue, because children with cryptogenic spasms statistically have a better chance of normal development than do children with symptomatic infantile spasms. As discussed above, Dr. Bennett opined that the chances of normal development for a child with cryptogenic infantile spasms, such as Kerri's, were 15 to 60 percent, absent the presence of pertussis. *Woodard,* Decision at 2. Respondent's witness, Dr. Lawrence Lockman,[12] also acknowledged that children with cryptogenic spasms generally have better chances of normal development, though he estimated that only about five or 10 per-

11. Dr. Bennett is a board-certified pediatric neurologist who serves as director of the Lamb Institute of Child Neurology and Developmental Medicine at Long Island College Hospital in New York.

12. Dr. Lockman is a board-certified pediatric neurologist and an associate professor of pediatric neurology at the University of Minnesota.

cent of his own patients with cryptogenic infantile spasms had experienced subsequent normal development. Tr. at 195.

Petitioners are mistaken, however, in arguing that the special master failed to recognize the distinction between cryptogenic and symptomatic spasms. As respondent points out, the special master acknowledged that Kerri's spasms were cryptogenic in nature and that children diagnosed with cryptogenic infantile spasms have a more optimistic prognosis than those with symptomatic spasms. *Woodard*, Decision at 6.

Petitioners are correct, nonetheless, in suggesting that the distinction between cryptogenic and symptomatic spasms ultimately had little bearing on the special master's decision. Dr. Bennett's testimony regarding the significance of the fact that Kerri's spasms were cryptogenic yields only a conclusion that Kerri, at some early point, had a statistically better chance of normal development than a similar child whose spasms were symptomatic. That conclusion, however, tells the court nothing about Kerri's own condition as of her second and third DPT shots, or about how her chances of normal development were affected by those shots.

Since Kerri did not get early medical treatment, petitioners are incorrect to suppose that she had a 15 to 60 percent chance of normal development before either her second or third DPT shot. Those statistics, as Dr. Bennett testified, were based on cases in which there was timely intervention. Dr. Bennett even admitted during his testimony that he could not have predicted Kerri's outcome as of her third DPT shot with any level of medical certainty. *Woodard*, Decision at 3. Therefore, the special master did not act unreasonably in finding that petitioners had failed to prove that Kerri's chances for normal development had been impaired by either the second or third DPT shot.

Petitioners also contend that the special master erroneously relied upon the testimony of Dr. Lockman, respondent's expert witness. Specifically, petitioners object to Dr. Lockman's opinion that all cases of infantile spasms had some underlying neurological cause, whether or not such cause is identifiable. Dr. Lockman also testified that diagnoses of infantile spasms are usually changed from cryptogenic to symptomatic because the underlying cause is eventually discovered, and he did not believe any case of infantile spasms could be described as having no cause at all. Tr. at 197–98. By contrast, petitioners' expert, Dr. Bennett, claimed that cryptogenic spasms sometimes have no underlying cause, rather than merely an undiscovered cause. Tr. at 164.

Despite petitioners' argument to the contrary, the special master did not adopt Dr. Lockman's belief that all cases of infantile spasms have an underlying cause, nor did the special master dispute that Kerri's spasms were cryptogenic in nature. This disagreement between the experts was not ultimately material to the outcome of this case. The special master needed to decide not whether Kerri's spasms had an underlying cause, but whether her condition had worsened as a result of the second and third DPT shots. On this point, the special master concluded:

> On this record, the court could only speculate as to whether the October 16 DPT shot played any causal role in Kerri's subsequent deterioration. The legal standard for proving actual causation has not been satisfied: The petitioners have not demonstrated a logical sequence of cause and effect supported by a reputable medical or scientific explanation.

*Woodard* Decision at 6.

## IV.

Finally, petitioners argue that the administration of the second and third DPT shots to Kerri by her pediatrician was contrary to the standards for pediatric immunization practices endorsed by the American Academy of Pediatrics. According to petitioners' expert, Dr. Bennett, the Academy recommends the withholding of DPT vaccine when there is evidence of an evolving neurological condition. Tr. at 158–59.

The respondent's expert witness, Dr. Lockman, disagreed with Dr. Bennett. Based on Dr. Lockman's understanding of the Academy's guidelines, a "static, stable neurological abnormality is not a contraindication to DPT immunization." Tr. at 205.

Dr. Lockman stated that he believed Kerri's condition was stable on October 16, the day she received her third DPT shot. *Id.* When asked by petitioners' counsel whether he would have administered the DPT vaccine to Kerri on that day if he had been her pediatrician, Dr. Lockman replied "Yes." Tr. at 204. Dr. Lockman also pointed out that "children with neurologic handicaps are at a special risk from ... contagious diseases, and immunization is probably even more important for them than for the general population." Tr. at 205.

However, because the special master based his conclusions adequately on other grounds—*i.e.*, that petitioners had failed to prove a causal link between Kerri's infantile spasms and the DPT vaccine—the court does not reach the question of whether Kerri's pediatrician acted in accordance with the appropriate standards of care when he gave her the second and third DPT shots.

### CONCLUSION

For the reasons set forth above, the court concludes that the special master's Decision was not arbitrary, capricious, or abuse of discretion, or contrary to law. Judgment is hereby entered for respondent. No costs.